GEOFFREY A. NERI, State Bar No. 258802
Geoff@bnsklaw.com
BROWN NERI & SMITH LLP
11601 Wilshire Blvd., Ste. 2080
Los Angeles, CA 90025
T: (310) 593-9890
F: (310) 593-9980

Attorneys for Plaintiff,
WOODSIDE CREDIT, LLC

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA—SOUTHERN DIVISION

| | |
|---|---|
| WOODSIDE CREDIT, LLC, a California limited liability corporation,<br><br>Plaintiff,<br><br>v.<br><br>ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>(1) **FRAUD;**<br>(2) **AIDING AND ABETTING FRAUD;**<br>(3) **CONSPIRACY;**<br>(4) **BREACH OF FIDUCIARY DUTY;**<br>(5) **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY;**<br>(6) **VIOLATION OF 18 U.S.C. § 1962(C) (RICO); AND**<br>(7) **VIOLATION OF 18 U.S.C. § 1962(D) (RICO).**<br><br>**DEMAND FOR JURY TRIAL** |

Plaintiff Woodside Credit, LLC, by and through undersigned counsel, allege for their Complaint (the "Complaint") against all Defendants, as follows:

## NATURE OF THE ACTION

1.  This action arises out of a conspiracy and fraudulent scheme formed and undertaken by Defendant Alexander G. Ramos ("Ramos"), who is currently in custody in the United States Federal Bureau of Prisons ("Federal Prison"), and his co-conspirators and accomplices Defendants Fadi Elias, Jennifer Pope, Classic Motors, Inc. and DOES 1 through 20.

2.  Ramos is the former Assistant Vice-President of Risk & Title Management of Plaintiff Woodside Credit, LLC ("Woodside").  Woodside is a company that provides lending facilities for consumers purchasing specialty, *i.e.*, "classic" and "collector" automobiles.  Ramos exploited his position at Woodside to misappropriate funds intended for tax, titling, and licensing expenses.

3.  As described herein, from 2017 to 2024, Ramos surreptitiously orchestrated unauthorized payments to himself and outside individuals and entities, including his co-defendants in this case, and illegally redirected Woodside funds to bank accounts that he controlled.  Ramos funneled no less than approximately four million dollars ($4 million) into these accounts and Woodside, by and through this action, seeks the recovery of no less than this amount in damages from the Defendants.

## PARTIES

4.  Plaintiff Woodside Credit, LLC ("Woodside") is a California limited liability company with its principal place of business in Orange County, California.

5.  Woodside is informed and believes, and thereon alleges, that Defendant Ramos is a citizen of the country of Mexico currently residing in Federal Prison.

6.  Woodside is informed and believes, and thereon alleges, that Defendant Fadi Elias is a citizen of the United States of America (the "United States") and a

resident of the State of Arizona.

7.  Woodside is informed and believes, and thereon alleges, that Defendant Jennifer Pope is a citizen of the United States and a resident of the State of Arizona.

8.  Woodside is informed and believes, and thereon alleges, that Defendant Classic Motors, Inc. ("Classic Motors") is a business entity with its principal place of business in the State of Arizona.

9.  The names of the Defendants and/or their involvement in this dispute are presently unknown to Plaintiffs, who therefore sue such Defendants in this action by fictitious names.  Each of the Defendants designated as a DOES 1-10 is legally responsible in some manner for the unlawful acts described above.  Plaintiffs will seek leave of the Court to amend this Complaint to reflect the true names and capacities of the DOE defendants as and when their identities become known.

10.  Plaintiff is informed and believes, and on that basis alleges, that except as otherwise alleged herein, each of the Defendants is, and at all times relevant to this Complaint was, the employee, agent, employer, partner, joint venture, affiliate, alter ego, and/or co-conspirator of each of the other Defendants and, in doing the acts alleged herein, was acting within the course and scope of such positions at the direction of, and/or with the permission, knowledge, consent, and/or ratification of the other Defendant.  In the alternative, Plaintiff is informed and believes, and on that basis alleges, that each Defendant, through its acts and omissions, is responsible for the wrongdoing alleged herein and for the damages suffered by Plaintiff.

## JURISDICTION AND VENUE

11. The court has jurisdiction over this action pursuant to U.S.C. §§ 1331 and 18 U.S.C. §§ 1964(c) and 1964(d).  Plaintiff's Sixth and Seventh Causes of Action arise under 28 U.S.C. § 1961 et. seq. as described herein.  Plaintiff's state law claims arise out of the same case or controversy as its federal claims, as all claims in this

action arise from a common nucleus of operative facts.  The court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

12.  This Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1332, as the parties are citizens of different states and/or countries and the amount in controversy exceeds $75,000, exclusive of interest and costs.

13.  Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(1) and (2) because at least one defendant resides in this district and because a substantial number of events giving rise to this action occurred in this district.

14.  This Court has personal jurisdiction over the defendants, and each of them, because each of them availed themselves of the benefits and protections of the State of California in their dealings with the Plaintiff, which resides in California, such that the Defendants, in engaging in the acts complained of in this Complaint, could reasonably expect to be haled into court in California.

## **FACTUAL ALLEGATIONS**

### A. **Summary of Woodside's Business**

15.  Woodside is engaged in the business of making consumer loans to purchasers of classic and collector automobiles in all fifty states of the United States.

16.  After a Woodside loan is funded, within seven to ten business days each loan is sold to a Federal or State regulated Community Bank ("Partner Banks").

17.  These Partner Banks purchase all rights, title and interest in and to each of the purchased loans and they also service those loans until such time as the loan is paid in full.

18.  Pursuant to agreements made with the Partner Banks, Woodside assists each Partner Bank with any collections, defaults or repossessions.  Woodside does everything from calling borrowers to collect payments, to putting automobiles out

for repossession, hiring counsel and filing complaints and reconditioning and selling any automobiles of which it takes repossession.

19. Woodside does not charge its Partner Banks for its services doing any of the collection work, but any costs paid by Woodside for the repossession and resale of repossessed automobiles (*i.e.* legal fees, towing, sales commissions, etc…) are deducted from the proceeds of the resale.

20. When Woodside repossesses a collateral vehicle, it will generally sell it in one of three ways, but regardless of which avenue of sale it pursues, the Partner Bank that owns the loan will always have the authority to either accept or decline any offer and Woodside will never accept an offer without the Partner Bank's approval. Three methods of sale are as follows:

(i) <u>Auction</u>. The automobile is sent to a public auction company, such as Manheim or Copart, and sold at auction; for any auction, the Partner Bank that owns the loan for the automobile will set a reserve price for the auction and the automobile will not sell unless that price is met;

(ii) <u>Consignment</u>. The automobile is put on consignment at a dealership that specializes in that brand of vehicle (*e.g.*, if Woodside repossess a Lamborghini, it will generally send it to a local Lamborghini Franchise or an independent seller of high-end exotics); for consignment sales, the Partner Bank that owns the loan for the automobile has the right to approve of the price at which the dealer will offer the automobile, and it will either not be sold until the asking price is met or, if the dealer receives an offer below the asking price, the offer will be presented to the Partner Bank to accept or reject

(iii) <u>Private Party Sale</u>. For a private party sale, Woodside will reach out to its contacts in the industry, primarily dealers and brokers, and it will

obtain a minimum of three written offers from these buyers. For private party sales, Woodside presents the three offers to the Partner Bank that owns the loan for the automobile and that bank will either accept or reject the highest offer.

**B. The TT&L Conspiracy and Fraudulent Scheme**

21. Defendant Alex Ramos ("Ramos") was hired by Woodside in 2017 and worked his way up from his initial role in Woodside's title department and was ultimately promoted in April of 2021 to the executive role of Assistant Vice President ("AVP"), Title & Risk Manager.

22. Even though Ramos was not promoted to AVP until 2021, he was essentially managing Woodside's title department starting in 2019. It was that position managing the title department that provided Ramos with access to the funds that he diverted in the course of the fraudulent scheme at issue in this case.

23. Woodside loans typically finance both the purchase price, minus the down payment made by the borrower (down payments average about 20%), and the sales tax, title and licensing fees ("TT&L Fees") in the loan amount.

24. The TT&L Fees are what is paid to the state departments of motor vehicles ("DMV"s) in order to pay the sales tax, register the vehicle in the customer's name, perfect Woodside's lien on title and get the borrower their license plates.

25. The TT&L Fees will vary based on the city/county and state where the consumer is registering the car, but in a typical loan the TT&L will equal six to eight percent (6% to 8%) of the purchase price of the vehicle.

26. If a customer is purchasing an automobile from a dealership that is located in the same state where the customer will be registering the vehicle (e.g., a California customer buys from a dealer in California), the dealership is required by law to

complete the registration on behalf of the customer. When that is the case Woodside will send the TT&L Fees to the dealer along with other loan funds.

27. Alternatively, if a customer is purchasing an automobile from a private party or an out-of-state dealer, Woodside will complete the title and registration for the customer. When Woodside funds the loan, it holds onto the TT&L Fees until the registration and title package is ready to be sent to the state DMV where the customer is registering their vehicle.

28. Once the title package is ready (*i.e.* Woodside has received the seller's title and other required paperwork) the documents are sent to a title agent in the state where the vehicle is to be registered, along with a check to pay for the TT&L Fees.

29. Woodside completes the title work for approximately seventy percent (70%) of its borrowers. In fiscal year 2023, which is when the bulk of the fraudulent scheme took place, Woodside funded 5,102 loans for a total of approximately five hundred and twenty-five million dollars ($525,000,000.00).

30. Using a six percent (6%) of the loan amount as an average for TT&L Fees, that means the title department was responsible for processing approximately $22 million dollars in TT&L fees in 2023 or $1.8 million dollars per month.

31. Ramos developed two primary schemes for stealing the TT&L money: In the first scheme Ramos conspired and worked with a title agent in the state of Montana known as "Agent for Montana Titles, Inc., a MT Domestic Profit Corporation", which was controlled by an individual named Amy Fisher (the "Montana Agent").

32. Ramos and the Montana Agent agreed that the Montana Agent would deposit checks with TT&L Fees for Woodside customers into a bank account controlled by the Montana Agent at Valley Bank, a Division of Glacier Bank, and then the Montana Agent would disburse those funds to wherever Ramos directed.

33.  Ramos would then take TT&L files from the Woodside employees that he managed and supervised "to handle himself".  These files would typically be loans with high dollar amounts for the TT&L Fees.   Ramos would then request a check from the Woodside accounting department, purportedly for payment the TT&L Fees, but instead of sending the funds to the title agent in the state where the borrower lived/wanted the automobile to be registered, he would send the funds to the Montana Agent to deposit in the account the Montana Agent controlled.

34.  Ramos would then siphon off this money to himself, primarily by having the Montana Agent write checks from this account back to Woodside Credit.  Ramos would receive these checks and deposit them into a Chase Bank account he had opened under the name "Ramos-Woodside Credit, LLC" (the "Ramos-Woodside account").   Woodside was entirely unaware that the Ramos-Woodside account had been created.   The Ramos-Woodside account was entirely controlled by Ramos and had no relationship otherwise to Woodside.   It was, in fact, Ramos' own personal piggy bank.

### C. The Ramos-Elias Defendants Conspiracy and Fraudulent Scheme

35.  Ramos' second scheme was conducted through a conspiracy with the Elias Defendants.   As set forth above, if and when a borrower defaults on his or her loan, Woodside repossesses the vehicle or if the borrower (or their estate if they passed away) chooses to surrender the vehicle to the Partner Bank, Woodside handles the entire process from taking possession of the vehicle through the sale and distribution of the proceeds to the Partner Bank.

36.  In his position as AVP and before as a manager of the risk department, Ramos was handling the vast majority of these repossessions and sales and was often the primary point of contact working directly with the Partner Banks to get their approval of the sale/purchase prices.

37.  As early as 2022, but at least beginning in 2023, Ramos and Defendants Fadi Elias ("Elias") and Jennifer Pope ("Pope") conspired and came to an agreement whereby Elias and/or Classic Motors, Inc. and/or Pope (the "Elias Defendants") would either be the high bidder on a repossessed vehicle that Woodside was selling on behalf of a Partner Bank or the Elias Defendants would offer a price close enough to the balance owed that Ramos was likely able to get the Partner Bank to agree to accept Elias Defendants' offer and Ramos would therefore not even need to get any additional bids.

38.  Once the Partner Bank agreed to the Elias Defendants' purchase price, the Elias Defendants would either wire the funds to Woodside and Woodside would deduct any of the collection costs and wire the balance to the Partner Bank or the Elias Defendants' would wire the funds directly to the bank.

39.  Shortly before or after the Elias Defendants had wired these funds and purchased the vehicle, Ramos would direct the Montana Agent to cut a check to the Elias Defendants to fraudulently "refund" to them a portion or all of what the Elias Defendants paid to purchase the vehicle.

40.  Elias admitted to this.  Elias said that Ramos told him that Woodside wanted the Partner Banks to believe that automobiles were selling for higher prices than what they would actually sell for.  The Elias Defendants would then sell the vehicle and keep the profits and, upon information and belief, share some of that profit with Ramos.

41.  Between March 23, 2023 and October 10, 2024, the Elias Defendants purchased at least 21 vehicles from Woodside's Partner Banks for a total of $1,801,000.

42.  During that same time period Ramos directed the Montana Agent to

send 48 checks and wires to Elias, Classic Motors and Pope (Elias' wife) for a total of $1,419,803 (the vast majority of these checks listed "Refund" in the memo on the check).

43. For example (*see* Excel spreadsheets attached hereto as <u>Exhibits "A"</u> and <u>"B"</u>):

(1) On 3/23/23 Elias purchased a 2019 Bentley Bentayga for $80,000 from First Financial Northwest Bank (the loan balance was $118k).

- The Montana Agent sent Elias a check on 3/15/23 for $11,465; and the Montana Agent sent Elias a check on 4/3/23 for $3,096; and the Montana Agent sent Elias a check on 4/14/23 for $11,465.

TOTAL "REFUND": $24,561

(2) On 12/27/23 Elias purchased a 2015 Bentley for $52,500 from Banc of California (the loan balance was $62k).

- The Montana Agent sent Elias a check on 12/28/23 for $35,000.

(3) On 2/9/24 Elias purchased a 2022 Aston Martin Vantage for $136,000 from Ireland Bank (the loan balance was $139k).

- The Montana Agent sent Pope a check on 2/8/24 for $35,000; and the Montana Agent sent Elias a check on 2/14/24 for $36,000;

TOTAL "REFUND": $71,000

**D. <u>Woodside Discovers the Conspiracy and Fraudulent Scheme and Ramos is Prosecuted for Wire and Mail Fraud</u>**

44. On or about October 10, 2024, Woodside's Title Department received a

call from borrower who was following up on the status of the New Jersey Title for the vehicle he had financed in June 2024. Ramos was out of the office at this time and upon reviewing the file, Title Officer Brooke Perez noted that this was one of the loan files that Ramos had selected to "handle himself."

45.  Ms. Perez then discovered that the Montana Agent had sent a check dated July 25, 2024, to the New Jersey Title Agent to pay for the borrower's TT&L Fees. Ms. Perez did not understand why a Montana title agent would be sending TT&L Fees to another state on behalf of Woodside and she reported her findings to Ramos' supervisor Brian Trevisan.

46.  Mr. Trevisan then discovered that Ramos had created a false check request directing Woodside's accounting department to send the New Jersey borrower's TT&L Funds to the Montana Agent on July 22, 2024. Woodside's accounting department began reviewing check requests from Ramos and discovered that in 2024 he had directed over $1 million dollars in TT&L Fees to the Montana Agent for borrowers who were not registering their vehicles in Montana.

47.  When Ramos returned to the office on or about October 15, 2024, Mr. Trevisan and another manager asked Mr. Ramos why TT&L Fees meant to complete borrower's registrations in other states were being sent to the Montana Agent. Ramos claimed the Montana Agent was able to "post taxes" with other state DMVs to avoid late fees if there were delays in completing the registration.

48.  Mr. Trevisan and Ms. Perez were unable to verify Ramos' claim regarding the posting of out-of-state taxes by the Montana Agent, and on or about October 17, 2024, Woodside management conducted a review of Ramos' Woodside email account and discovered emails where Ramos directed the Montana Agent issue checks to Classic Motors for $35,000 on October 4, 2024, and another $40,000 on October 8, 2024.

49.  On October 18, 2024, Woodside's CEO asked Ramos to explain why he was directing the Montana Agent to send funds to Classic Motor. When Mr. Ramos was unable to provide a legitimate justification, Woodside locked Ramos out of the company systems and escorted him from the office.

50.  Woodside then contacted the Montana Agent and she volunteered to share all bank records for the account that was being used to deposit the TT&L Funds and write checks to Classic Motors.

51.  On October 20, 2024, Woodside determined that the Montana Agent had written checks to "Woodside Credit" totaling more than $1 million dollars that were sent to Ramos and deposited into the Chase Bank Account he controlled.

52.  On October 20, 2024, Woodside contacted the Newport Beach Police Department ("NBPD") and reported the theft of more than $1 million dollars by Ramos.

53.  Over the course of the next two weeks the NBPD notified Woodside that, due to the nature of the crime (wire fraud, check fraud), the fact that it took place across multiple states and the amount of money stolen, the investigation and prosecution of Mr. Ramos was being referred to the Federal Bureau of Investigation ("FBI") and the U.S. Attorney for the Central District of California.

54.  On or about November 8, 2024, investigators from the FBI came to Woodside's office to conduct interviews and begin their investigation of Ramos and the criminal conspiracy and fraud described here.

55.  On May 22, 2025, the FBI arrested Ramos and he was charged with wire Fraud and being an illegal alien in the United States following deportation. Woodside is informed and believes that Ramos has accepted a plea agreement and is currently awaiting sentencing.  As of the date of the filing of this Complaint, the

Elias Defendants have not yet been arrested or charged in connection with the conspiracy and criminal fraud described herein.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### (Fraud—Against All Defendants)

56.   Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

57.   The conduct of Defendants, and each of them, as described above constitutes a fraud against the Plaintiff.  Defendants, and each of them, violated California Civil Code Sections 1709 and 1710, and are liable for deceit, and specifically fraudulent concealment.

58.    Defendants, and each of them, concealed facts, which they were bound to disclose, or gave information of other facts which were likely to mislead for want of communication of the concealed facts, in violation of Section 1710(3).

59.   As a result of Defendants' and each of their fraudulent conduct, the Plaintiff has suffered economic losses and other general and specific damages, all in an amount to be determined according to proof

60.   The aforementioned acts and omissions of Defendants and each of them, were done maliciously, oppressively, and/or with intent to defraud, and the Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

## SECOND CAUSE OF ACTION

### (Aiding and Abetting Fraud—Against the Elias Defendants and DOES 1-20)

61.   Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

62.   The Elias Defendants and DOES 1-20, and each of them, aided and

abetted, encouraged and rendered substantial assistance to Ramos in accomplishing the wrongful conduct of Ramos and other wrongdoing complained of herein.

63.   In taking action, as particularized herein, to aid and abet and substantially assist the commission of these wrongful acts and other wrongdoings complained of, each of the Elias Defendants and DOES 1-20 acted with an awareness of his/its primary wrongdoing and realized that his/its conduct would substantially assist the accomplishment of the wrongful conduct, wrongful goals, and wrongdoing.

64.   As a result of the Elias Defendants' and DOES 1-20's aiding and abetting of fraud, the Plaintiff has suffered economic losses and other general and specific damages, all in an amount to be determined according to proof.

65.   The aforementioned acts and omissions of the Elias Defendants and DOES 1-20 were done maliciously, oppressively, and/or with intent to defraud, and the Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

### THIRD CAUSE OF ACTION

### (Conspiracy to Commit Fraud—Against All Defendants)

66.  Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

67.   There was an agreement between Ramos and the Elias Defendants and DOES 1-20 to commit an unlawful act or a lawful act by unlawful means, more specifically fraud, and an overt act in furtherance of the conspiracy.

68.   Each Defendant was a direct, necessary and substantial participant in the conspiracy, common enterprise and common course of conduct complained of herein, and was aware of his/its, overall contribution to. and furtherance of the conspiracy. Defendants' overt acts of in further of the conspiracy include all of the

acts that each of them is alleged to have committed in furtherance of the fraud complained of herein.

69.    As a result of Defendants' conspiracy, the Plaintiff has suffered economic losses and other general and specific damages, all in an amount to be determined according to proof.

70.    The aforementioned acts and omissions of Defendants and each of them, were done maliciously, oppressively, and/or with intent to defraud, and the Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

## FOURTH CAUSE OF ACTION

### (Breach of Fiduciary Duty—Against Defendant Ramos)

71.    Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

72.    By reason of his position as an Assistant Vice President at Woodside, Ramos owed fiduciary duties to Plaintiff, including the duties of good faith, undivided loyalty, and reasonable care, and the duty to refrain from self-dealing.

73.    Ramos breached his fiduciary duties to Plaintiff by engaging in the wrongful conduct described above.

74.    As a result of Ramos' breach of fiduciary duty, the Plaintiff has suffered economic losses and other general and specific damages, all in an amount to be determined according to proof.

75.    The aforementioned acts and omissions of Ramos were done maliciously, oppressively, and/or with intent to defraud, and the Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

## FIFTH CAUSE OF ACTION

### (Aiding and Abetting Breach of Fiduciary Duty—Against the Elias

**Defendants and DOES 1-10)**

76.   Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

77.   The Elias Defendants and DOES 1-20, and each of them, aided and abetted, encouraged and rendered substantial assistance to Ramos in breaching his fiduciary duties to Plaintiff.

78.   In taking action, as particularized herein, to aid and abet and substantially assist the commission of Ramos' breach of fiduciary duties, the Elias Defendants and DOES 1-20 acted with an awareness of his fiduciary duties and that their conduct would substantially assist Ramos in breaching his fiduciary duties.

79.   As a result of the Elias Defendants' and DOES 1-20's aiding and abetting of breach of fiduciary duty, the Plaintiff has suffered economic losses and other general and specific damages, all in an amount to be determined according to proof.

80.   The aforementioned acts and omissions of the Elias Defendants and DOES 1-20 were done maliciously, oppressively, and/or with intent to defraud, and the Plaintiff is entitled to an award of punitive and exemplary damages in an amount to be determined at time of trial.

## SIXTH CAUSE OF ACTION

### (Violation of 18 U.S.C. § 1962(c) (RICO)– Against All Defendants)

81.   Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

82.   At all relevant times, Defendants were persons within the meaning of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961(3) and 1962(c).

83.   For well over a year, Defendants conducted or participated in a pattern of

racketeering activity within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C.§ 1962(c).  To the extent known at this time, that pattern included scores of related acts of mail fraud and wire fraud.

84.   By reason of these violations of RICO by the Defendants, Plaintiff has sustained damages to its business and property.   Plaintiff's damages include, but are not limited, to monetary and reputational damages, as well as attorneys' fees and costs incurred exposing and identifying the pervasive fraud alleged above.

85.   These damages were a direct, proximate and foreseeable result of the violations by the Defendants of 18 U.S.C. § 1962(c) in carrying out the racketeering scheme.   By reason of these violations, Plaintiff has been and will continue to be injured in its business and property in an ultimate amount to be determined at trial.

86.   By reason of these RICO violations, Plaintiff is entitled to recover three times its damages pursuant to 18 U.S.C. § 1964(c).

87.   By reason of these violations, Plaintiff is further entitled to recover its attorney's fees and costs pursuant to 18 U.S.C. § 1964(c).

## SEVENTH CAUSE OF ACTION

### (Violation of 18 U.S.C. § 1962(d) (RICO)– Against All Defendants)

88.    Plaintiff hereby incorporates by reference all of the above paragraphs, as if fully set forth in this cause of action.

89.    Defendant Ramos conspired with Elias Defendants and DOES 1-20 to commit the racketeering acts that violate 18 U.S.C. §§ 1962(c), in violation of 18 U.S.C. § 1962(d).  At all relevant times, each of the Defendants was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(d).

90.   In furtherance of this conspiracy, each of the Defendants agreed to the commission of at least two of the acts of racketeering set forth in Plaintiff's Sixth Cause of Action, and agreed to violate 18 U.S.C. §§ 1962(c).

91.   By reason of these violations of RICO by the Defendants, Plaintiff has sustained damages to its business and property.   Plaintiff's damages include, but are not limited, to monetary and reputational damages, as well as attorneys' fees and costs incurred exposing and identifying the pervasive fraud alleged above.

92.   These damages were a direct, proximate and foreseeable result of the violations by the Defendants of 18 U.S.C. § 1962(c) in carrying out the racketeering scheme.   By reason of these violations, Plaintiff has been and will continue to be injured in its business and property in an ultimate amount to be determined at trial.

93.   By reason of these RICO violations, Plaintiff is entitled to recover three times its damages pursuant to 18 U.S.C. § 1964(c).

94.   By reason of these violations, Plaintiff is further entitled to recover its attorneys fees' and costs pursuant to 18 U.S.C. § 1964(c).

### **PRAYER FOR RELIEF**

Wherefore Plaintiff prays for relief as follows:

ON THE FIRST THROUGH FIFTH CAUSES OF ACTION:

1.     For general damages according to proof at trial, in an amount not less than $4,000,000.00 plus interest;

2.     For punitive and exemplary damages in an amount to be proven at trial; and

3.     For prejudgment interest.

ON THE SIXTH AND SEVENTH CAUSES OF ACTION:

4.     For general damages according to proof at trial, trebled pursuant to statute, 18 U.S.C. § 1964(c);

17.     For prejudgment interest according to statute; and

18.     For Plaintiff's reasonable attorneys' fees and costs pursuant to statute, 18 U.S.C. § 1964(c).

Dated:    September 21, 2025                    BROWN, NERI & SMITH LLP


                                               By:   s/  Geoffrey A. Neri
                                               Geoffrey A. Neri,

                                               Attorneys for Plaintiff,
                                               Woodside Credit, LLC


## **DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues so triable.


Dated:    September 21, 2025                    BROWN, NERI & SMITH LLP


                                               By:   s/  Geoffrey A. Neri
                                               Geoffrey A. Neri,

                                               Attorneys for Plaintiff,
                                               Woodside Credit, LLC

# EXHIBIT "A"

| Loan Number | Collateral Vehicle | Bank Name | Loan Date | Date of Recovery | Purchaser | Date Sold | Orignal Balance | Charge off Amount | Sold Price of Vehicle | % of purchase price to amount owed bank | Total Expenses | Net Amount Recovered | % of loan balance recovered | Total Loss | Bank Loss |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 334948 | 2019 Bentley Bentayga | FFNWB | 8/26/2019 | 2/28/2023 | Fadi | 3/23/2023 | $107,400.05 | $118,943.52 | $80,000.00 | 67% | $1,250.00 | $96,833.00 | 81% | ($22,110.52) | ($22,110.52) |
| 339741 | 2015 Mercedes G Class | TCB | 1/14/2020 | 5/15/2023 | Fadi | 6/15/2023 | $59,626.00 | $51,179.66 | $55,000.00 | 107% | $11,330.00 | $43,670.00 | 85% | ($7,509.66) | ($7,509.66) |
| 185925 | 1970 Dodge Dart | CCB | 09/212016 | 9/29/2023 | Fadi | 10/18/2023 | $26,622.00 | $8,124.28 | $7,000.00 | 86% | $0.00 | $7,000.00 | 86% | ($1,124.28) | ($1,124.28) |
| 357219 | 2013 Bentley Continental | BOC | 10/27/2020 | 10/3/2023 | Fadi | 10/20/2023 | $82,939.29 | $68,855.02 | $61,500.00 | 89% | $500.00 | $61,000.00 | 89% | ($7,855.02) | ($7,855.02) |
| 198123 | 2012 Bentley | BOC | 7/17/2017 | 9/1/2023 | Fadi | 12/27/2023 | $99,463.00 | $61,969.00 | $52,500.00 | 85% | $7,610.15 | $44,889.85 | 72% | ($17,079.15) | ($17,079.15) |
| 395892 | 2018 Porsche 911 | CWB | 6/7/2022 | 12/13/2023 | Fadi | 1/18/2024 | $102,148.41 | $114,334.49 | $94,500.00 | 83% | $1,500.00 | $93,000.00 | 81% | ($21,334.49) | ($21,334.49) |
| 407058 | 2022 Aston Martin Vantage | IB | 10/29/2022 | 11/29/2023 | Fadi | 2/9/2024 | $147,477.34 | $139,484.79 | $136,000.00 | 98% | $11,947.96 | $124,052.04 | 89% | ($15,432.75) | ($15,432.75) |
| 416723 | 1965 Ford Mustang | EXB | 3/15/2023 | 11/23/2023 | Fadi | 2/25/2024 | $59,896.70 | $64,014.75 | $65,000.00 | 102% | $1,000.00 | $64,000.00 | 100% | ($14.75) | ($14.75) |
| 362211 | 2000 Bentley Azure | EXB | 2/4/2021 | 10/25/2023 | Fadi | 3/13/2024 | $61,425.00 | $52,670.13 | $41,500.00 | 79% | $500.00 | $41,000.00 | 78% | ($11,670.13) | ($11,670.13) |
| 393402 | 2020 Mercedes  Benz AMG GT C R | EXB | 5/10/2022 | 10/3/2023 | Fadi | 3/13/2024 | $134,129.03 | $128,442.30 | $105,000.00 | 82% | $515.00 | $104,485.00 | 81% | ($23,957.30) | ($23,957.30) |
| 423836 | 1963 Chevrolet Corvette | CVCB | 7/31/2023 | 12/3/2023 | Fadi | 3/14/2024 | $183,682.48 | $181,958.87 | $148,500.00 | 82% | $3,500.00 | $145,000.00 | 80% | ($36,958.87) | ($36,958.87) |
| 419227 | 1965 Backdraft Shelby Replica | TCB | 4/18/2023 | 2/22/2024 | Fadi | 3/27/2024 | $111,401.75 | $108,214.88 | $105,000.00 | 97% | $580.00 | $104,420.00 | 96% | ($3,794.88) | ($3,794.88) |
| 386050 | 1974 Pontiac GTO | DSB | 1/27/2022 | 3/5/2024 | Fadi | 4/28/2024 | $43,282.00 | $35,126.68 | $32,500.00 | 93% | $400.00 | $32,100.00 | 91% | ($3,026.68) | ($3,026.68) |
| 376659 | 2018 Rolls Royce Wraith | CWB | 8/25/2021 | 10/31/2023 | Fadi | 5/12/2024 | $241,294.30 | $246,316.64 | $200,000.00 | 81% | $2,000.00 | $198,000.00 | 80% | ($48,316.64) | ($48,316.64) |
| 400845 | 2006 Lotus Elise | EXB | 8/5/2022 | 4/11/2024 | Fadi | 5/31/2024 | $45,239.00 | $39,820.85 | $32,500.00 | 82% | $1,000.00 | $31,500.00 | 79% | ($8,320.85) | ($8,320.85) |
| 300538 | 2012 Mclaren Mp-4 | BOTP | 6/8/2018 | 5/20/2024 | Fadi | 6/8/2024 | $107,208.75 | $75,694.15 | $65,000.00 | 84% | $3,553.50 | $61,446.50 | 81% | ($14,247.65) | ($14,247.65) |
| 371199 | 2021 Rolls Royce Ghost | CWB | 6/4/2021 | 2/16/2024 | Fadi | 6/13/2024 | $379,937.58 | $272,822.35 | $245,000.00 | 90% | $1,750.00 | $243,250.00 | 89% | ($29,572.35) | ($29,572.35) |
| 405608 | 2013 Porshce 911 | IB | 10/14/2022 | 10/14/2022 | Fadi | 6/28/2024 | $57,656.57 | $53,026.80 | $47,500.00 | 90% | $375.00 | $47,125.00 | 89% | ($5,901.80) | ($5,901.80) |
| 392549 | 2008 Bentley Continental | CCB | 4/19/2022 | 6/25/2024 | Fadi | 8/8/2024 | $58,244.55 | $51,484.10 | $47,000.00 | 91% | $0.00 | $47,000.00 | 91% | ($4,484.10) | ($4,484.10) |
| 383308 | 2011 Ferrari California | EXB | 12/17/2021 | 7/26/2024 | Fadi | 9/23/2024 | $100,075.00 | $85,120.00 | $80,000.00 | 94% | $550.00 | $79,450.00 | 93% | ($5,670.00) | ($5,670.00) |
| 430970 | 2023 Osprey Custom 4x4 | EXB | 9/12/2023 | 8/9/2024 | Fadi | 10/10/2024 | $111,429.22 | $119,885.67 | $100,000.00 | 83% | $500.00 | $99,500.00 | 83% | ($20,385.67) | ($20,385.67) |
| 427579 | 1972 Chevrolet Chevelle | BOC | 8/7/2023 | 4/12/2024 | Fadi | Stolen | $47,138.00 | | Woodside paid $36,000.00 to the bank | | | | | | |
| 434340 | 2019 Rolls Royce | BOM | 11/21/2023 | loss | Fadi | Stolen | $299,990.98 | | Woodside paid $322,723.92 to the bank | | | | | | |
| 305148 | 2005 Rolls Royce Wraith | BOC | 8/22/2018 | loss | Fadi | Stolen | $79,803.03 | | Woodside paid $22,169.09 to the bank | | | | | | |
| 383801 | 2020 Mercedes G Class | BOM | 12/17/2021 | loss | Fadi | Stolen | $234,891.69 | | Woodside paid $218,933.38 to the bank | | | | | | |
| | | | | | | TOTAL | $2,320,578.02 | $2,077,488.93 | $1,801,000.00 | AVG 88% | | $1,768,721.39 | AVG 86% | | |

# EXHIBIT "B"

| CHECKS & WIRES FROM AGENT FOR MONTANA TITLES INC (Valley Bank of Helena - Glacier Bank Account) TO CLASSIC MOTOR INC, FADI ELIAS & JENNIFER POPE | | | |
|---|---|---|---|
| **AMOUNT** | **DATE** | **CHECK NO.** | **PAYABLE TO** |
| $11,465.00 | 3/15/2023 | 239 | Fadi Elias |
| $3,096.00 | 4/3/2023 | 271 | Classic Motor Inc |
| $10,000.00 | 4/14/2023 | 248 | Fadi Elias |
| $15,000.00 | 6/30/2023 | 291 | Fadi Elias |
| $30,000.00 | 7/18/2023 | 295 | Classic Motor Inc |
| $25,000.00 | 7/26/2023 | 298 | Classic Motor Inc |
| $15,000.00 | 8/7/2023 | 300 | Classic Motor Inc |
| $20,000.00 | 9/5/2023 | 319 | Classic Motor Inc |
| $20,382.00 | 9/11/2023 | 320 | Classic Motor Inc |
| $30,000.00 | 9/18/2023 | 325 | Classic Motor Inc |
| $7,413.00 | 9/22/2023 | 327 | Classic Motor Inc |
| $25,000.00 | 10/5/2023 | 334 | Classic Motor Inc |
| $12,000.00 | 10/12/2023 | 338 | Classic Motor Inc |
| $35,000.00 | 10/27/2023 | 1006 | Fadi Elias |
| $35,000.00 | 11/27/2023 | 344 | Classic Motor Inc |
| $12,235.00 | 12/4/2023 | 351 | Classic Motor Inc |
| $25,000.00 | 12/14/2023 | 356 | Classic Motor Inc |
| $35,000.00 | 12/28/2023 | 361 | Classic Motor Inc |
| $2,500.00 | 1/10/2024 | 370 | Classic Motor Inc |
| $22,500.00 | 1/11/2024 | 372 | Classic Motor Inc |
| $25,000.00 | 1/15/2024 | 374 | Classic Motor Inc |
| $35,000.00 | 1/20/2024 | 377 | Classic Motor Inc |
| $35,000.00 | 1/29/2024 | 382 | Classic Motor Inc |
| $9,450.00 | 2/1/2024 | 385 | Fadi Elias |
| $35,000.00 | 2/8/2024 | 386 | Jennifer Pope |
| $36,000.00 | 2/14/2024 | 390 | Classic Motor Inc |
| $40,000.00 | 2/21/2024 | 391 | Classic Motor Inc |
| $40,000.00 | 3/7/2024 | 395 | Classic Motor Inc |
| $19,007.00 | 3/22/2024 | 422 | Fadi Elias |
| $40,000.00 | 4/9/2024 | 434 | Classic Motor Inc |
| $22,500.00 | 4/22/2024 | 402 | Classic Motor Inc |
| $25,000.00 | 4/29/2024 | 404 | Classic Motor Inc |
| $11,700.00 | 5/15/2024 | 411 | Classic Motor Inc |
| $11,700.00 | 5/25/2024 | 437 | Classic Motor Inc |
| $28,300.00 | 5/29/2024 | 442 | Classic Motor Inc |
| $25,000.00 | 6/10/2024 | 444 | Fadi Elias |
| $10,500.00 | 6/10/2024 | 445 | Classic Motor Inc |
| $35,000.00 | 6/23/2024 | 447 | Classic Motor Inc |
| $200,000.00 | 7/5/2024 | Wire Transfer | Classic Motor Inc |
| $43,730.00 | 7/9/2024 | 412 | Classic Motor Inc |
| $100,000.00 | 7/22/2024 | Wire Transfer | Classic Motor Inc |
| $55,000.00 | 7/25/2024 | Wire Transfer | Classic Motor Inc |
| $10,325.00 | 8/10/2024 | 464 | Fadi Elias |
| $25,000.00 | 9/10/2024 | 470 | Classic Motor Inc |
| $20,000.00 | 9/17/2024 | 476 | Classic Motor Inc |
| $15,000.00 | 9/22/2024 | 478 | Classic Motor Inc |
| $35,000.00 | 10/9/2024 | 486 | Classic Motor Inc |
| $40,000.00 | 10/10/2024 | 487 | Classic Motor Inc |
| **TOTAL** | | | |
| **$1,419,803.00** | | | |