Geoffrey Neri (SBN 258802)
Geoff@bnsklaw.com
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

WOODSIDE CREDIT, LLC, a California limited liability company,

Plaintiff,

vs.

ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,

Defendants.

Case No. 8:25-cv-02146-FWS-JDE

**NOTICE OF MOTION AND MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT ALEXANDER G. RAMOS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

*[Filed concurrently with Declaration of Geoffrey A. Neri; Declaration of Brian Trevisan; Request for Judicial Notice; Application for Leave to File Under Seal; and [Proposed] Default Judgment]*

Date: September 24, 2026
Time: 10:00 a.m.
Crtrm.: 10A
Judge: Hon. Fred W. Slaughter

Complaint Filed: Sept. 22, 2025
Trial Date: February 2, 2027

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

**PLEASE TAKE NOTICE** that on September 24, 2026, at 10:00 a.m., or as soon thereafter as counsel may be heard, in Courtroom 10A of the above-entitled Court, located at the Ronald Reagan Federal Building and United States Courthouse, 411 West Fourth Street, Santa Ana, California 92701, Plaintiff Woodside Credit, LLC ("Woodside" or "Plaintiff") will, and hereby does, move the Court, pursuant to Federal Rule of Civil Procedure 55(b)(2) and Local Rule 55-1, for entry of default judgment against Defendant Alexander G. Ramos ("Ramos") on the Fourth Cause of Action of the Complaint (Breach of Fiduciary Duty), and, pursuant to Federal Rule of Civil Procedure 54(b), for an express determination that there is no just reason for delay and a direction that final judgment be entered on that claim (the "Motion").

By the Motion, Woodside seeks entry of judgment against Ramos awarding:

1. Compensatory damages in the amount of **$1,890,005.07**, as established by the evidence submitted herewith — an amount well within the $4,000,000 demanded in the Complaint's Prayer for Relief, consistent with Federal Rule of Civil Procedure 54(c);
2. Prejudgment interest in the amount of $230,822.32, calculated at the rate of seven percent (7%) per annum pursuant to California Civil Code section 3287 and article XV, section 1 of the California Constitution through September 24, 2026, plus $362.47 per day thereafter until entry of judgment;
3. Costs of suit, to be taxed in accordance with Local Rule 54; and
4. An express determination, pursuant to Federal Rule of Civil Procedure 54(b), that there is no just reason for delay, and a direction that judgment be entered as final on the Fourth Cause of Action as against Ramos.

The Motion is deliberately narrow. Woodside does not seek default judgment at this time on the First (Fraud), Third (Conspiracy), Sixth (18 U.S.C. § 1962(c)), or Seventh (18 U.S.C. § 1962(d)) Causes of Action asserted against Ramos, each of which is also asserted against Defendants Fadi Elias, Jennifer Pope, and Classic Motors, Inc. (the “Elias Defendants”), who have appeared and are defending this action. Woodside reserves those claims for resolution after the claims against the Elias Defendants are adjudicated. Nor does Woodside seek punitive damages or attorneys’ fees by the Motion.

The Motion is made on the grounds that: (1) Ramos was personally served with the Summons and Complaint on January 8, 2026, within the deadline extended by the Court, and failed to answer or otherwise respond; (2) the Clerk entered Ramos’s default on February 5, 2026 (Dkt. 31); (3) the well-pleaded allegations of the Complaint, taken as true upon default, establish each element of Ramos’s liability for breach of fiduciary duty; (4) each of the factors identified in *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986), supports entry of default judgment; (5) Woodside’s damages are established by the declarations and documentary evidence submitted herewith; and (6) because the Fourth Cause of Action is asserted against Ramos alone and rests on fiduciary duties that only Ramos owed, entry of judgment presents no risk of inconsistent adjudications with respect to the claims against the Elias Defendants, and there is no just reason to delay entry of final judgment — particularly given the final order of forfeiture entered July 7, 2026 in Ramos’s parallel criminal case and his sentencing, set for October 8, 2026.

The Motion is based on this Notice of Motion and Motion, the accompanying Memorandum of Points and Authorities, the Declaration of Geoffrey A. Neri (“Neri Decl.”) and the exhibits thereto, the Declaration of Brian Trevisan (“Trevisan Decl.”) and the exhibits thereto, the Request for Judicial Notice (“RJN”) filed concurrently herewith, the [Proposed] Default Judgment lodged concurrently herewith, all pleadings, records, and

files in this action, all matters of which the Court may take judicial notice, and such further evidence and argument as may be presented at or before the hearing.

Pursuant to Local Rule 55-2, because the Motion seeks unliquidated damages, notice of the Motion and all supporting papers will be served on Ramos by U.S. mail, concurrently with the filing of the Motion, addressed to Alexander G. Ramos, USM No. 86299071, Santa Ana City Jail, 62 Civic Center Plaza, Santa Ana, California 92701, notwithstanding his default and non-appearance. (Neri Decl. ¶ 10.)

**This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which took place by telephone on May 8, 2026**, between the undersigned counsel for Plaintiff and Benjamin S. Levine of the Law Offices of Dale K. Galipo, counsel of record for the Elias Defendants — the only defendants who have appeared in this action. Ramos has not appeared, and no conference with him was required or feasible. During the conference, counsel for the Elias Defendants took no definitive position on the Motion; his principal inquiries concerned Woodside's proof of damages and the potential effect of a damages determination on the claims involving the Elias Defendants. (Neri Decl. ¶¶ 13–14.) The accompanying Memorandum addresses both subjects. (*See* §§ IV.D–IV.F, *infra*.)

DATED: August 24, 2026

BROWN NERI SMITH & KHAN LLP

By: */s/ Geoffrey A. Neri*
Geoffrey A. Neri
Attorney for Plaintiff
Woodside Credit, LLC

## TABLE OF CONTENTS


I. INTRODUCTION ........ 8

II. STATEMENT OF FACTS ........ 9

A. Woodside's Business and Ramos's Position of Trust ........ 9

B. Ramos's Misappropriation Schemes ........ 10

C. Discovery of the Fraud; Ramos's Parallel Criminal Case ........ 11

D. Procedural History; Entry of Default ........ 12

E. The Local Rule 7-3 Conference ........ 13

III. LEGAL STANDARD ........ 14

IV. ARGUMENT ........ 15

A. The Court Has Subject Matter and Personal Jurisdiction, Venue Is Proper, and Ramos Was Properly Served ........ 15

B. The Procedural Prerequisites for Default Judgment Are Satisfied ........ 15

C. The Eitel Factors Uniformly Favor Entry of Default Judgment ........ 16

D. Woodside's Damages Are Established by Competent Evidence and Are Capped at the Amount Demanded in the Complaint ........ 19

E. Because the Fourth Cause of Action Is Asserted Against Ramos Alone, Judgment Creates No Risk of Inconsistent Adjudications ........ 21

F. The Court Should Direct Entry of Final Judgment Under Rule 54(b) ........ 23

V. CONCLUSION ........ 25

# TABLE OF AUTHORITIES

**Cases**

*Aldabe v. Aldabe*, 616 F.2d 1089 (9th Cir. 1980)....................14
*Burnham v. Superior Court*, 495 U.S. 604 (1990)....................15
*Children's Hospital & Medical Center v. Bontá*, 97 Cal. App. 4th 740 (2002)....................21
*Curtiss-Wright Corp. v. General Electric Co.*, 446 U.S. 1 (1980)....................23
*Davis v. Fendler*, 650 F.2d 1154 (9th Cir. 1981)....................14
*EEOC v. Waffle House, Inc.*, 534 U.S. 279 (2002)....................23
*Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986)....................passim
*Frow v. De La Vega*, 82 U.S. (15 Wall.) 552 (1872)....................9, 22
*GAB Business Services, Inc. v. Lindsey & Newsom Claim Services, Inc.*, 83 Cal. App. 4th 409 (2000)....................17
*Geddes v. United Financial Group*, 559 F.2d 557 (9th Cir. 1977)....................14, 17, 19
*Greater Westchester Homeowners Ass'n v. City of Los Angeles*, 26 Cal. 3d 86 (1979)....21
*Henry v. Sneiders*, 490 F.2d 315 (9th Cir. 1974)....................20
*Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400 (2007)....................17
*In re First T.D. & Investment, Inc.*, 253 F.3d 520 (9th Cir. 2001)....................9, 22
*In re Tuli*, 172 F.3d 707 (9th Cir. 1999)....................15
*Michelson v. Hamada*, 29 Cal. App. 4th 1566 (1994)....................20, 21
*Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949 (9th Cir. 2008)...21
*PepsiCo, Inc. v. California Security Cans*, 238 F. Supp. 2d 1172 (C.D. Cal. 2002)...passim
*Reeves v. Hanlon*, 33 Cal. 4th 1140 (2004)....................17
*Philip Morris USA, Inc. v. Castworld Products, Inc.*, 219 F.R.D. 494 (C.D. Cal. 2003)...18
*Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995 (N.D. Cal. 2001)......22
*Stanley v. Richmond*, 35 Cal. App. 4th 1070 (1995)....................17

*Taylor v. Sturgell*, 553 U.S. 880 (2008)....................23
*TeleVideo Systems, Inc. v. Heidenthal*, 826 F.2d 915 (9th Cir. 1987)....................14
*Texaco, Inc. v. Ponsoldt*, 939 F.2d 794 (9th Cir. 1991)....................24
*Wood v. GCC Bend, LLC*, 422 F.3d 873 (9th Cir. 2005)....................23

**Statutes & Constitutional Provisions**

18 U.S.C. § 981....................12, 24
18 U.S.C. § 1962....................3, 15
18 U.S.C. § 1964(c)....................15
18 U.S.C. §§ 3663A, 3664....................12, 24
28 U.S.C. §§ 1331, 1332, 1367, 1391, 2461....................12, 15
28 C.F.R. pt. 9....................12, 24
50 U.S.C. § 3911 (Servicemembers Civil Relief Act)....................16
Cal. Civ. Code §§ 3287, 3288, 3333....................2, 19, 20, 21
Cal. Const., art. XV, § 1....................21

**Rules**

Fed. R. Civ. P. 4, 8(b)(6), 54(b), 54(c), 55....................passim
C.D. Cal. L.R. 7-3, 54, 55-1, 55-2, 11-6.1....................14, 26

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I. INTRODUCTION**

Defendant Alexander G. Ramos, Woodside's former Assistant Vice President of Risk & Title Management, used the authority Woodside entrusted to him to loot the company. Over a period spanning 2017 to 2024, Ramos diverted Woodside funds earmarked for customers' sales tax, title, and licensing obligations ("TT&L Fees") into a bank account he secretly opened and controlled under the name "Ramos-Woodside Credit, LLC," and caused additional Woodside funds to be paid out as sham "refunds" in connection with sales of repossessed collateral vehicles. (Compl. ¶¶ 2–3, 21–43 & Exs. A–B.) The United States prosecuted Ramos for the same conduct: he was arrested by the FBI on May 22, 2025, charged with mail fraud, wire fraud, and illegal reentry, and has pleaded guilty pursuant to a plea agreement. His sentencing is set for October 8, 2026. (Compl. ¶¶ 53–55; RJN Exs. 1–3.) The criminal court has already entered both a preliminary and a final order of forfeiture, vesting in the United States clear title to Ramos's principal known asset — his residence in Irvine, California — although a third-party petitioner's appeal from the final forfeiture order is pending. (RJN Exs. 4–5.)

Ramos was personally served with the Summons and Complaint on January 8, 2026, within the deadline this Court extended for that purpose. He never answered, appeared, or otherwise defended. The Clerk entered his default on February 5, 2026. (Dkt. 31.) Woodside now moves for default judgment under Rule 55(b)(2).

The Motion is deliberately narrow, in three respects. *First*, it seeks judgment on a single claim — the Fourth Cause of Action for breach of fiduciary duty — the only cause of action pleaded against Ramos alone, and the only claim that rests on duties no other defendant is alleged to have owed. A judgment on that claim cannot conflict with any ruling on the claims the appearing defendants (the "Elias Defendants") are litigating, so

the concerns addressed in *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552 (1872), and *In re First T.D. & Investment, Inc.*, 253 F.3d 520 (9th Cir. 2001), are not implicated. Woodside expressly reserves its overlapping claims against Ramos — fraud, conspiracy, and RICO — for resolution after the case against the Elias Defendants concludes. *Second*, Woodside's damages showing rests on evidence, not allegations — and on a deliberately conservative measure: Woodside seeks only its actual, unreimbursed out-of-pocket remediation costs, $1,890,005.07, documented payment-by-payment in its accounting records, rather than the more than $4 million that flowed through the accounts Ramos controlled or directed. The request is well within the $4,000,000 demanded in the Complaint, as Rule 54(c) requires. *Third*, Woodside forgoes punitive damages and seeks no attorneys' fees on this claim.

Every *Eitel* factor favors judgment. And because Ramos is incarcerated, faces removal from the United States following his October 2026 sentencing, and his principal known asset has already been forfeited to the government, there is no just reason to delay entry of final judgment. Woodside respectfully requests that the Court grant the Motion and direct entry of judgment under Rule 54(b).

## II. STATEMENT OF FACTS

### A. Woodside's Business and Ramos's Position of Trust

Woodside is a California limited liability company, headquartered in Orange County, that makes consumer loans to purchasers of classic and collector automobiles nationwide. (Compl. ¶¶ 4, 15.) After funding, each loan is sold to a federally or state-regulated community bank (a "Partner Bank"); Woodside assists its Partner Banks with collections, defaults, and repossessions, including the resale of repossessed collateral subject to Partner Bank approval. (Compl. ¶¶ 16–20.)

Woodside loans typically finance not only the vehicle purchase price but also the associated TT&L Fees — the sales tax, title, and licensing amounts remitted to state departments of motor vehicles. (Compl. ¶¶ 23–25.) Where a customer purchases from a private party or out-of-state dealer, Woodside itself holds the TT&L Fees and later remits them, through a title agent, to the DMV of the customer's state. (Compl. ¶¶ 27–28.) The sums involved are large: in fiscal year 2023 alone, Woodside funded 5,102 loans totaling approximately $525 million, and its title department was responsible for processing approximately $22 million in TT&L Fees. (Compl. ¶¶ 29–30.)

Ramos joined Woodside in 2017, effectively ran its title department beginning in 2019, and in April 2021 was promoted to the executive position of Assistant Vice President, Title & Risk Manager. (Compl. ¶¶ 21–22.) In that role, Ramos exercised discretionary authority over the disbursement of TT&L Fees, supervised the employees who processed them, handled the majority of Woodside's repossessions and resales, and served as a primary point of contact with the Partner Banks. (Compl. ¶¶ 22, 33, 36.)

**B. Ramos's Misappropriation Schemes**

Ramos exploited that authority through two schemes. In the first, Ramos conspired with a Montana title agent — "Agent for Montana Titles, Inc.," controlled by Amy Fisher (the "Montana Agent") — to divert TT&L Fees. (Compl. ¶¶ 31–32.) Ramos selected loan files with large TT&L amounts "to handle himself," caused Woodside's accounting department to issue TT&L checks to the Montana Agent for borrowers who had no Montana connection, and directed the Montana Agent to disburse the deposited funds as he instructed — principally by writing checks back to "Woodside Credit" that Ramos deposited into a Chase Bank account he had secretly opened under the name "Ramos-Woodside Credit, LLC," an account with no actual relationship to Woodside. (Compl. ¶¶ 32–34.) In 2024 alone, Ramos directed over $1 million in TT&L Fees to the Montana

Agent for borrowers who were not registering vehicles in Montana, and the Montana Agent's account records reflect more than $1 million in checks written to "Woodside Credit" that were deposited into Ramos's Chase account. (Compl. ¶¶ 46, 51.)

In the second scheme, Ramos corrupted Woodside's repossession-sale process. Ramos arranged for the Elias Defendants to purchase repossessed vehicles at prices he presented to the Partner Banks and then, shortly before or after each purchase, directed the Montana Agent to send the purchasers sham "refund" checks — drawn from misappropriated Woodside TT&L funds — of a portion or all of the purchase price. (Compl. ¶¶ 35–40.) Between March 23, 2023 and October 10, 2024, 48 such checks and wires totaling $1,419,803 were sent to Fadi Elias, Jennifer Pope, and Classic Motors, Inc., most bearing the memo "Refund." (Compl. ¶¶ 41–43 & Exs. A–B.)

In total, from 2017 through 2024, Ramos funneled no less than approximately $4 million of Woodside's funds through accounts he controlled or directed. (Compl. ¶ 3.)

**C. Discovery of the Fraud; Ramos's Parallel Criminal Case**

Woodside discovered the scheme in October 2024, when a borrower's title inquiry led Woodside personnel to a TT&L check that the Montana Agent — inexplicably — had sent to a New Jersey title agent, and from there to Ramos's false check requests. (Compl. ¶¶ 44–46.) After Ramos was unable to explain payments the Montana Agent had made to Classic Motors at his direction, Woodside locked him out of its systems, obtained the Montana Agent's bank records, and reported the theft to the Newport Beach Police Department, which referred the matter to the FBI and the U.S. Attorney's Office for this District. (Compl. ¶¶ 47–54.)

On May 22, 2025, the FBI arrested Ramos. (Compl. ¶ 55.) In *United States v. Ramos*, No. 8:25-cr-00106-FWS (C.D. Cal.), Ramos was charged with mail fraud (18 U.S.C. § 1341), wire fraud (18 U.S.C. § 1343), illegal reentry following deportation (8

U.S.C. § 1326(a), (b)(2)), and criminal forfeiture (18 U.S.C. § 981(a)(1)(C); 28 U.S.C. § 2461(c)) — charges arising from the same fraudulent scheme alleged in this action — and has pleaded guilty pursuant to a plea agreement. (RJN Exs. 1–3; Compl. ¶ 55.) His sentencing is set for October 8, 2026. The United States Attorney's Office has formally identified Woodside as a victim of Ramos's criminal conduct, and Woodside anticipates that restitution will be addressed at sentencing under the Mandatory Victims Restitution Act, 18 U.S.C. §§ 3663A, 3664. (Neri Decl. ¶ 11.)

The criminal forfeiture proceedings are already well advanced. On September 17, 2025, the court entered a Preliminary Order of Forfeiture forfeiting Ramos's right, title, and interest in the real property located at 142 Princess Pine, Irvine, California 92618. (Crim. Dkt. 28; RJN Ex. 4.) After publication and written notice to third parties, on July 7, 2026 the court granted the government's application for a final order of forfeiture, vesting clear title to the property in the United States and directing its sale, with the proceeds to be applied to costs of sale, property taxes, a recognized lienholder (New Wave Lending Group, Inc., up to $765,000), and an $11,000 payment to a third-party petitioner — and the entire balance forfeited to the United States. (Crim. Dkt. 54; RJN Ex. 5.) On July 17, 2026, the third-party petitioner, Debbie Fengjie Chen, appealed the final forfeiture order to the Ninth Circuit (No. 26-4596); Woodside is informed that the government anticipates the appeal may delay distribution of the forfeiture proceeds by six to twelve months, but not that the property will be restored to Ramos. (Neri Decl. ¶ 12; RJN Ex. 1.) Woodside did not — and could not — recover in the ancillary proceeding; as a general fraud victim, its avenues to the forfeited value are restitution at sentencing and a petition for remission or restoration of forfeited proceeds. *See* 18 U.S.C. § 981(e)(6); 28 C.F.R. pt. 9.

**D. Procedural History; Entry of Default**

Woodside filed this action on September 22, 2025, asserting seven causes of action. (Dkt. 1.) Only the Fourth Cause of Action — breach of fiduciary duty — is asserted against Ramos alone. (Compl. ¶¶ 71–75.) The Elias Defendants answered on November 6, 2025 (Dkt. 19), and the claims against them are proceeding in discovery.

Service on Ramos required diligence because he was in custody and his facility location was uncertain. Following the Court's December 23, 2025 Order to Show Cause regarding Rule 4(m), Woodside demonstrated good cause and obtained an extension of the service deadline through January 15, 2026. (Dkt. 24.) On January 8, 2026 — within the extended deadline — a registered process server personally served Ramos with the Summons, Complaint, and related case documents at 62 Civic Center Plaza, Santa Ana, California. (Neri Decl. ¶ 4 & Ex. A; Dkt. 28 (proof of service).)

Ramos's responsive pleading was due January 29, 2026. Fed. R. Civ. P. 12(a)(1)(A)(i). He filed nothing, and no attorney has appeared for him. On February 2, 2026, Woodside requested entry of default (Dkt. 30), supported by a declaration addressing Ramos's service, his non-infant/non-incompetent status, and his non-military status under the Servicemembers Civil Relief Act. The Clerk entered Ramos's default on February 5, 2026. (Dkt. 31; Neri Decl. ¶¶ 6–7 & Ex. B.)

### E. The Local Rule 7-3 Conference

On April 24, 2026, the undersigned wrote to counsel for the Elias Defendants describing this anticipated Motion, its deliberately narrow scope, and the intended request for Rule 54(b) certification, and on May 8, 2026, conferred by telephone with Benjamin S. Levine of the Law Offices of Dale K. Galipo. (Neri Decl. ¶¶ 13–14.) Mr. Levine did not commit to a position on the Motion; his principal questions concerned Woodside's proof of damages and the potential effect of a damages determination on the claims involving his clients. (*Id.*) Sections IV.D through IV.F below address those subjects.

## III. LEGAL STANDARD

Obtaining a default judgment is a two-step process: the Clerk first enters the party's default under Rule 55(a); the plaintiff then applies to the Court for a default judgment under Rule 55(b)(2). *See* Fed. R. Civ. P. 55; *Eitel v. McCool*, 782 F.2d 1470, 1471 (9th Cir. 1986). Whether to enter default judgment lies within the Court's discretion. *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980). In exercising that discretion, courts weigh the seven *Eitel* factors: (1) the possibility of prejudice to the plaintiff; (2) the merits of the plaintiff's substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether the default was due to excusable neglect; and (7) the strong policy favoring decisions on the merits. *Eitel*, 782 F.2d at 1471–72; *see PepsiCo, Inc. v. Cal. Sec. Cans*, 238 F. Supp. 2d 1172, 1174–75 (C.D. Cal. 2002).

Upon entry of default, the well-pleaded factual allegations of the complaint — except those relating to damages — are taken as true. *Geddes v. United Fin. Grp.*, 559 F.2d 557, 560 (9th Cir. 1977); *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917–18 (9th Cir. 1987); Fed. R. Civ. P. 8(b)(6). Damages, by contrast, must be proven. *Geddes*, 559 F.2d at 560. The Court may rely on declarations and documentary evidence and need not hold an evidentiary hearing where the amounts claimed are ascertainable from definite figures in the record. *See* Fed. R. Civ. P. 55(b)(2); *Davis v. Fendler*, 650 F.2d 1154, 1161 (9th Cir. 1981). Local Rule 55-1 requires that the application be accompanied by a declaration establishing: (a) when and against which party default was entered; (b) the pleading to which default was entered; (c) whether the defaulting party is an infant or incompetent person; (d) that the Servicemembers Civil Relief Act does not apply; and (e) that notice of the application has been served on the defaulting party, if required by Rule 55(b)(2). C.D. Cal. L.R. 55-1.

## IV. ARGUMENT

### A. The Court Has Subject Matter and Personal Jurisdiction, Venue Is Proper, and Ramos Was Properly Served

Before entering default judgment, a court appropriately assures itself of its jurisdiction over the subject matter and the defaulting party. *In re Tuli*, 172 F.3d 707, 712 (9th Cir. 1999).

*Subject matter jurisdiction* exists under 28 U.S.C. § 1331 because the Complaint pleads federal RICO claims, 18 U.S.C. §§ 1962(c), (d), 1964(c), and the Court has supplemental jurisdiction over the Fourth Cause of Action under 28 U.S.C. § 1367(a) because the fiduciary-duty claim arises from the same nucleus of operative facts — Ramos's misappropriation of Woodside funds — as the federal claims. (Compl. ¶ 11.) The Complaint also alleges diversity jurisdiction under 28 U.S.C. § 1332. (Compl. ¶ 12.)

*Personal jurisdiction* over Ramos exists at minimum because he was personally served with process while physically present in California. *See Burnham v. Superior Court*, 495 U.S. 604, 619 (1990) (plurality opinion). Independently, the claim arises out of Ramos's conduct in California as an executive of a California company: he was employed by Woodside in Orange County, misappropriated funds entrusted to him there, and directed his scheme at a California plaintiff. (Compl. ¶¶ 4, 14, 21–22.)

*Venue* is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims occurred in this District. (Compl. ¶ 13.)

*Service* was proper. On January 8, 2026, a registered California process server personally delivered the Summons and Complaint to Ramos, satisfying Rule 4(e)(2)(A), within the service deadline the Court extended to January 15, 2026 upon Woodside's showing of good cause. (Neri Decl. ¶¶ 3–4; Dkt. 28.)

### B. The Procedural Prerequisites for Default Judgment Are Satisfied

Each requirement of Local Rule 55-1 is met, as established by the Neri Declaration:

(a) *Entry of default.* The Clerk entered default against Ramos on February 5, 2026. (Dkt. 31; Neri Decl. ¶ 6 & Ex. B.)

(b) *Pleading.* Default was entered on Woodside's Complaint filed September 22, 2025. (Dkt. 1.)

(c) *Not an infant or incompetent person.* Ramos is an adult who was employed by Woodside as an executive from 2017 to 2024, and nothing in this action or his parallel criminal proceedings suggests incompetence. (Neri Decl. ¶ 8.)

(d) *The Servicemembers Civil Relief Act does not apply.* Ramos is not in the military service of the United States as defined by 50 U.S.C. § 3911; he has been in federal custody since his May 22, 2025 arrest. (Neri Decl. ¶ 9 & Ex. C.)

(e) *Notice.* Because Ramos has never appeared, the seven-day written notice requirement of Rule 55(b)(2) is not triggered. Nonetheless, because the Motion seeks unliquidated damages, Woodside will serve the Motion and all supporting papers on Ramos by mail at his place of incarceration, concurrently with filing, pursuant to Local Rule 55-2. (Neri Decl. ¶ 10.)

### C. The *Eitel* Factors Uniformly Favor Entry of Default Judgment

#### *1. Woodside Will Be Prejudiced Absent Default Judgment*

If default judgment is denied, Woodside "will likely be without other recourse for recovery" against Ramos. *PepsiCo*, 238 F. Supp. 2d at 1177. Ramos has ignored this action for over a year while in custody; he cannot be compelled to litigate, and the claims against him cannot be tried in his absence in any practical sense. Meanwhile, the costs of delay are not hypothetical: Ramos's principal known asset — his Irvine residence — has been finally forfeited to the United States, to be sold with the net balance held by the

government rather than available to satisfy Woodside's claims. (RJN Exs. 4–5.) A third party's pending appeal of the forfeiture order may delay distribution, but on no outcome does the property return to Ramos's creditors. Ramos also faces removal from the United States after his October 2026 sentencing. (Neri Decl. ¶ 15.) Each month of delay further narrows Woodside's realistic paths to recovery. The first factor favors judgment.

***2. The Complaint's Well-Pleaded Allegations Establish Ramos's Liability for Breach of Fiduciary Duty (Factors Two and Three)***

The second and third *Eitel* factors — the merits of the claim and the sufficiency of the complaint — are commonly analyzed together and require that the complaint state a claim on which the plaintiff may recover. *PepsiCo*, 238 F. Supp. 2d at 1175. Under California law, breach of fiduciary duty requires: (1) the existence of a fiduciary relationship; (2) breach of the duty; and (3) damage proximately caused by the breach. *Stanley v. Richmond*, 35 Cal. App. 4th 1070, 1086 (1995). Each element is well pleaded and, upon default, admitted. *Geddes*, 559 F.2d at 560.

*Duty.* A corporate officer who participates in management, exercising discretionary authority, is a fiduciary of the corporation as a matter of law. *GAB Bus. Servs., Inc. v. Lindsey & Newsom Claim Servs., Inc.*, 83 Cal. App. 4th 409, 420–21 (2000), *disapproved on other grounds by Reeves v. Hanlon*, 33 Cal. 4th 1140, 1154 (2004). Likewise, an employee-agent owes his principal "undivided loyalty." *Huong Que, Inc. v. Luu*, 150 Cal. App. 4th 400, 410–14 (2007). Ramos was Woodside's Assistant Vice President of Title & Risk Management, ran its title department, controlled the disbursement of tens of millions of dollars in TT&L Fees, and managed repossession sales with Partner Banks — a quintessential position of trust. (Compl. ¶¶ 21–22, 33, 36, 72.)

*Breach.* Ramos engaged in systematic self-dealing and concealment: he diverted TT&L Fees through the Montana Agent into his sham "Ramos-Woodside Credit, LLC"

account; fabricated check requests; concealed the diversions from Woodside; and orchestrated sham "refunds" of Woodside funds to purchasers of repossessed vehicles, deceiving both Woodside and its Partner Banks. (Compl. ¶¶ 31–43, 46–51, 73.) These acts breached his duties of loyalty, good faith, and honest performance — and he has pleaded guilty to federal fraud charges arising from the very same scheme. (RJN Ex. 3.)

*Causation and damage.* Ramos's breaches proximately caused Woodside substantial losses — no less than $1,890,005.07 in actual out-of-pocket losses resulting from the more than $4 million Ramos funneled from Woodside between 2017 and 2024, including over $1 million in TT&L Fees diverted in 2024 alone and $1,419,803 paid out as sham "refunds" between March 2023 and October 2024. (Compl. ¶¶ 3, 41–43, 46, 51, 74 & Exs. A–B; Trevisan Decl. ¶¶ 5–6, 10 & Ex. 1.)

These allegations are corroborated — not merely presumed true — by Ramos's guilty plea in the parallel criminal case arising from the same conduct. (RJN Ex. 3.) Factors two and three strongly favor judgment.

***3. The Sum at Stake Is Substantial but Proportionate and Fully Documented***

Under the fourth factor, "the court must consider the amount of money at stake in relation to the seriousness of Defendant's conduct." *PepsiCo*, 238 F. Supp. 2d at 1176. The amount here — $1,890,005.07 plus interest — is substantial, but it is compensatory only, deliberately conservative (it is Woodside's documented out-of-pocket remediation cost, not the larger sums that flowed through the accounts Ramos controlled), tied payment-by-payment to Woodside's accounting records, and proportionate to a years-long embezzlement scheme to which Ramos has pleaded guilty. *See Philip Morris USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 500 (C.D. Cal. 2003) (entering $2 million default judgment where the sum, though substantial, was justified by the defendant's conduct).

Woodside seeks no punitive damages and no attorneys' fees by this Motion. This factor favors judgment.

***4. There Is No Possibility of a Genuine Dispute of Material Fact***

The well-pleaded allegations are admitted by default, *Geddes*, 559 F.2d at 560; they are documented in contemporaneous accounting and banking records (Trevisan Decl. ¶¶ 4–9, Exs. 1–2); and Ramos has admitted the underlying conduct by his guilty plea (RJN Ex. 3). No genuine dispute is possible. This factor favors judgment.

***5. Ramos's Default Was Not the Product of Excusable Neglect***

Ramos was personally served on January 8, 2026, and has actual knowledge of the facts underlying this action — he is being prosecuted for them in this very courthouse. His failure to respond in the more than seven months since service reflects a deliberate choice not to defend, not excusable neglect. This factor favors judgment.

***6. The Policy Favoring Decisions on the Merits Does Not Preclude Judgment***

While cases "should be decided upon their merits whenever reasonably possible," *Eitel*, 782 F.2d at 1472, Ramos's refusal to appear "makes a decision on the merits impractical, if not impossible." *PepsiCo*, 238 F. Supp. 2d at 1177. This factor does not outweigh the six that favor judgment.

**D. Woodside's Damages Are Established by Competent Evidence and Are Capped at the Amount Demanded in the Complaint**

A plaintiff must prove the amount of its damages notwithstanding the default, *Geddes*, 559 F.2d at 560, and may do so by declaration and documentary evidence without an evidentiary hearing where the amounts are ascertainable from definite figures. *Davis*, 650 F.2d at 1161. The measure of damages for breach of fiduciary duty is governed by Civil Code section 3333: the fiduciary is liable for all loss his breach proximately caused, including the amounts his principal was required to expend to remedy

the misconduct. *See Michelson v. Hamada*, 29 Cal. App. 4th 1566, 1583 (1994) (damages for breach of fiduciary duty measured under Civil Code section 3333).

Woodside's proof here is unusually direct. Because Ramos diverted funds that Woodside held to pay its borrowers' tax, title, and licensing obligations — and corrupted repossession-sale transactions Woodside handled for its Partner Banks — Woodside had to pay, a second time and out of its own pocket, the amounts needed to make its borrowers and Partner Banks whole. Woodside's accounting department tracked every such payment in a dedicated loss-due-to-theft schedule: **109 payments between October 24, 2024 and February 20, 2026, totaling $1,890,005.07**, each identified by date, check or reference number, payee, affected loan, and amount. (Trevisan Decl. ¶¶ 4–6 & Ex. 1.) The payments comprise re-payment of diverted borrower TT&L obligations (replacement title agents, state DMVs, VIN verification services, and direct borrower refunds); $912,979.93 in payoffs and principal reductions to Partner Banks on transactions Ramos corrupted; and related out-of-pocket costs. (*Id.* ¶ 6.) It is the same loss schedule Woodside provided to the United States Attorney's Office in the parallel criminal case. (*Id.* ¶ 5.)

This remediation-cost measure is deliberately conservative. Woodside does *not* separately seek the face amounts of the TT&L checks Ramos diverted, the $1,419,803 in sham "refunds" paid to the Elias Defendants from those diverted funds, or the sums deposited into Ramos's "Ramos-Woodside Credit, LLC" account — the diverted dollars are what made the remediation necessary, and seeking both would double count the same loss. (Trevisan Decl. ¶ 8.) The request is thus a floor, not a ceiling, on the harm Ramos caused. And at $1,890,005.07, it is well within the $4,000,000 in compensatory damages demanded in the Complaint's Prayer, as Rule 54(c) requires. Fed. R. Civ. P. 54(c) (default judgment "must not differ in kind from, or exceed in amount, what is demanded in the pleadings"); *Henry v. Sneiders*, 490 F.2d 315, 317 (9th Cir. 1974).

One disclosure completes the picture. Woodside's gross remediation outlay was $2,260,423.66. Among the losses Woodside remediated was its payoff of a Partner Bank loan on a borrower's stolen vehicle: the vehicle's insurer had issued a total-loss payoff check to Woodside, Ramos intercepted that check and deposited it into his "Ramos-Woodside Credit, LLC" account, and Woodside — after discovering the theft — paid off the Partner Bank itself. When Woodside's ensuing claim to the insurer was resolved, the insurer reissued payment of $370,418.59. Exhibit 1, and this Motion, are net of that recovery: the $1,890,005.07 Woodside seeks is its actual, unreimbursed out-of-pocket loss. (Trevisan Decl. ¶ 11.)

*Prejudgment interest.* State law governs prejudgment interest on state-law claims. *Oak Harbor Freight Lines, Inc. v. Sears Roebuck & Co.*, 513 F.3d 949, 961 (9th Cir. 2008). Woodside is entitled to interest as of right under Civil Code section 3287(a) because its damages are certain, or capable of being made certain by calculation — each remediation payment is of a known amount on a known date. *See Children's Hosp. & Med. Ctr. v. Bontá*, 97 Cal. App. 4th 740, 772–75 (2002). Alternatively, the Court, sitting as the trier of fact on this Motion, may award interest under Civil Code section 3288. *See Greater Westchester Homeowners Ass'n v. City of Los Angeles*, 26 Cal. 3d 86, 102–03 (1979); *Michelson*, 29 Cal. App. 4th at 1587. The applicable rate is seven percent per annum. Cal. Const., art. XV, § 1; *Children's Hosp.*, 97 Cal. App. 4th at 775. Interest computed on each payment from the date Woodside made it through September 24, 2026 totals **$230,822.32**, accruing at **$362.47** per day thereafter. (Trevisan Decl. ¶ 12 & Ex. 3.)

Woodside will separately seek its taxable costs by application to the Clerk under Local Rule 54 following entry of judgment.

**E. Because the Fourth Cause of Action Is Asserted Against Ramos Alone, Entry of Judgment Creates No Risk of Inconsistent Adjudications**

At the Local Rule 7-3 conference, counsel for the Elias Defendants asked how a default judgment against Ramos might affect the claims involving his clients. The answer is: it will not — and the Motion is structured to guarantee that result.

*Frow* holds that where liability is joint, a court should not enter final judgment against a defaulting defendant while the claim proceeds against answering defendants, lest the case produce logically inconsistent judgments. *Frow v. De La Vega*, 82 U.S. (15 Wall.) 552, 554 (1872). The Ninth Circuit has extended *Frow* to defendants who, though not jointly liable, are "similarly situated" such that judgment against the defaulter would be "incongruous and unfair" if the answering defendants later prevailed on the *same legal theory*. *In re First T.D. & Inv., Inc.*, 253 F.3d 520, 532 (9th Cir. 2001). Where the defaulting defendant's liability is independent of the claims against the answering defendants, *Frow* does not bar default judgment. *See Shanghai Automation Instrument Co. v. Kuei*, 194 F. Supp. 2d 995, 1008–09 (N.D. Cal. 2001).

That is precisely the situation here, by design. The Fourth Cause of Action is pleaded against Ramos *alone*, and its dispositive element — the fiduciary duties of loyalty and good faith arising from Ramos's executive employment at Woodside — is unique to him. (Compl. ¶¶ 71–75.) The Elias Defendants are not alleged to have owed Woodside any fiduciary duty; they are sued on different theories (aiding and abetting, conspiracy, fraud, and RICO) that Woodside is *not* moving on, against Ramos or anyone else. No outcome on the claims the Elias Defendants are litigating — including outright judgment in their favor — could logically contradict a judgment that Ramos breached his own duties to his employer. There is no scenario of the kind *Frow* and *First T.D.* guard against.

Nor will the damages award prejudice the Elias Defendants. A default judgment binds only Ramos; the Elias Defendants, who were strangers to the prove-up, cannot be bound by it as a matter of due process, and they remain free to contest every element of

the claims against them — including the existence and amount of Woodside's losses. *See Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (a nonparty is not bound by a judgment in litigation in which it did not participate). And Woodside acknowledges the settled rule against double recovery: any amounts Woodside actually recovers from Ramos or on account of his conduct — including through criminal restitution or any remission or restoration of forfeited funds — for a given loss will be credited against any later recovery from any other defendant for the same loss. *Cf. EEOC v. Waffle House, Inc.*, 534 U.S. 279, 297 (2002) (quoting *General Telephone Co. of Northwest v. EEOC*, 446 U.S. 318, 333 (1980)) ("courts can and should preclude double recovery by an individual"); 18 U.S.C. § 3664(j)(2). The [Proposed] Judgment so provides. Entry of judgment against Ramos therefore resolves the concerns defense counsel raised — while securing Woodside's rights against the one defendant who has refused to litigate at all.

**F. The Court Should Direct Entry of Final Judgment Under Rule 54(b)**

Rule 54(b) permits the Court, "when an action presents more than one claim for relief" or involves multiple parties, to "direct entry of a final judgment as to one or more, but fewer than all, claims or parties" upon "an express determination that there is no just reason for delay." Fed. R. Civ. P. 54(b). The Court first determines that the ruling is "final" as to a claim, then weighs "juridical concerns" — chiefly whether the adjudicated and pending claims are so interrelated that piecemeal appeals would result — together with the equities. *Curtiss-Wright Corp. v. Gen. Elec. Co.*, 446 U.S. 1, 7–8, 10 (1980); *Wood v. GCC Bend, LLC*, 422 F.3d 873, 878 (9th Cir. 2005).

Both requirements are met. A default judgment on the Fourth Cause of Action fully and finally adjudicates that claim as to Ramos. And the juridical concerns are minimal: the fiduciary-duty claim rises and falls on Ramos's own duties and conduct — issues no remaining defendant will litigate — so certification creates no realistic prospect that the

court of appeals would confront the same issues twice. *See Texaco, Inc. v. Ponsoldt*, 939 F.2d 794, 797–98 (9th Cir. 1991) (certification proper where adjudicated claims were sufficiently severable from those remaining).

The equities strongly support certification, and recent events in the Criminal Action make the point concrete rather than abstract. *First*, dissipation of Ramos's assets is not a future risk — it is underway. On July 7, 2026, the criminal court entered a final order of forfeiture vesting in the United States clear title to Ramos's principal known asset, his Irvine residence; upon sale, after costs, taxes, a $765,000 lien, and an $11,000 third-party payment, the entire net balance will be forfeited to the government. (RJN Exs. 4–5; Neri Decl. ¶ 12.) A third-party petitioner's pending Ninth Circuit appeal may delay distribution of those proceeds — a window that favors resolving Woodside's claim now, so that Woodside holds a final judgment quantifying its loss before any distribution occurs — but no outcome of that appeal returns the property to Ramos. *Second*, Ramos will be sentenced in October 2026, and restitution to Woodside — which the government has formally identified as a victim — is expected to be addressed there under the MVRA, 18 U.S.C. §§ 3663A, 3664. A final civil judgment quantifying Woodside's loss before sentencing will fix Woodside's position and assist the restitution process, and any restitution actually paid will be credited against the judgment, precisely as 18 U.S.C. § 3664(j)(2) contemplates. *Third*, to the extent the forfeited sale proceeds are the most realistic source of recovery, Woodside's avenue is a petition for remission or restoration of forfeited property under 18 U.S.C. § 981(e)(6) and 28 C.F.R. part 9 — and a judgment establishing the amount of Woodside's loss materially strengthens such a petition. *Fourth*, upon completion of his sentence Ramos faces removal from the United States, after which obtaining and enforcing a judgment will be substantially harder. A judgment now permits Woodside to record abstracts, reach any non-forfeited assets, and participate meaningfully

in the restitution and remission processes; a judgment deferred until the end of the litigation against the Elias Defendants may be worth little.

Neither the forfeiture nor the prospect of restitution is a reason to withhold judgment. Restitution and civil remedies are cumulative, not exclusive; the criminal process compensates only what it reaches, on the government's timetable, and the MVRA itself presupposes parallel civil judgments by requiring offsets between them. 18 U.S.C. § 3664(j)(2). Woodside's civil judgment — with its express single-satisfaction credit — protects Ramos against double collection while preserving Woodside's rights against assets and amounts the criminal process never reaches.

In the alternative, should the Court decline to direct entry of final judgment under Rule 54(b), Woodside requests that the Court grant the Motion, adjudicate Ramos's liability and Woodside's damages on the Fourth Cause of Action now, and defer entry of the final judgment until resolution of the remaining claims.

## V. CONCLUSION

For the foregoing reasons, Woodside respectfully requests that the Court grant the Motion and enter default judgment against Defendant Alexander G. Ramos on the Fourth Cause of Action in the amount of $1,890,005.07, plus prejudgment interest of $230,822.32 through the hearing date (accruing at $362.47 per day thereafter until entry of judgment), plus costs to be taxed under Local Rule 54; direct entry of final judgment pursuant to Rule 54(b); and grant such other relief as the Court deems just. A [Proposed] Default Judgment is lodged concurrently herewith.

DATED: August 24, 2026

BROWN NERI SMITH & KHAN LLP

By: */s/ Geoffrey A. Neri*
Geoffrey A. Neri
Attorney for Plaintiff
Woodside Credit, LLC

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Plaintiff Woodside Credit, LLC, certifies that this brief contains 5,733 words, which complies with the word limit of L.R. 11-6.1.

DATED: August 24, 2026

BROWN NERI SMITH & KHAN LLP

By: */s/ Geoffrey A. Neri*
Geoffrey A. Neri
Attorney for Plaintiff
Woodside Credit, LLC