Geoffrey Neri (SBN 258802)
Geoff@bnsklaw.com
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

| | |
|---|---|
| WOODSIDE CREDIT, LLC, a California limited liability company,<br><br>Plaintiff,<br><br>vs.<br><br>ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,<br><br>Defendants. | Case No. 8:25-cv-02146-FWS-JDE<br><br>**PLAINTIFF WOODSIDE CREDIT, LLC'S OPPOSITION TO DEFENDANTS FADI ELIAS, JENNIFER POPE, AND CLASSIC MOTORS, INC.'S MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION; ALTERNATIVE REQUEST UNDER FED. R. CIV. P. 56(d)**<br><br>[Filed concurrently with Statement of Genuine Disputes; Declaration of Geoffrey A. Neri and exhibits thereto; Declaration of Brian Trevisan; and Evidentiary Objections]<br><br>Date: October 15, 2026<br>Time: 10:00 a.m.<br>Crtrm.: 10A<br><br>Complaint Filed: Sept. 22, 2025<br>Trial Date: February 2, 2027 |

# TABLE OF CONTENTS


I. INTRODUCTION ... 6

II. STATEMENT OF FACTS ... 8

A. Woodside, Its Partner Banks, and Ramos ... 8

B. The Elias Defendants' Transactions With Ramos ... 8

C. The Elias Defendants' Discovery Responses ... 11

III. LEGAL STANDARD ... 12

IV. ARGUMENT ... 12

A. Knowledge and Intent Are Disputed Questions of Fact ... 12

1. State of Mind Is Proven by Circumstantial Evidence and Decided by Juries ... 12

2. The Record Supports the Inference That the Elias Defendants Knew ... 14

3. The Declarations Cannot Carry the Motion ... 16

B. Ramos's Title Is Not a Defense ... 17

C. Each Claim Presents Triable Issues ... 18

1. Aiding and Abetting Fraud and Breach of Fiduciary Duty (Second and Fifth Claims) ... 18

2. Conspiracy (Third Claim) ... 20

3. Fraudulent Concealment (First Claim) ... 21

4. RICO (Sixth and Seventh Claims) ... 21

D. Rule 37(c)(1) Provides No Basis for Judgment ... 23

E. Alternatively, the Court Should Defer or Deny the Motion Under Rule 56(d) ... 24

V. CONCLUSION ... 26

## TABLE OF AUTHORITIES

**Cases**

*Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253 (9th Cir. 2010) .................................... 7
*Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451 (2014) ............. 19
*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................... 12, 16
*Baumer v. Pachl*, 8 F.3d 1341 (9th Cir. 1993) ............................................................ 22
*Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802 (2005) ............................................................................................ 19, 21
*Boyle v. United States*, 556 U.S. 938 (2009) ............................................................ 21
*Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528 (9th Cir. 1985) .................................... 12
*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ........................................... 14
*Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138 (2005) .......................... 18, 19, 20
*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................ 24
*Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032 (S.D. Cal. 2019) .................................... 24
*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822 (9th Cir. 2008) ............................................................................................ 24
*FeedMe Trading LLC v. My Fish Stop LLC*, No. CV 23-08857-MWF (JCx), 2024 WL 5257016 (C.D. Cal. Oct. 10, 2024) ............................................................ 25
*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003) ........................................................... 9
*Gilbert v. MoneyMutual, LLC*, No. 13-cv-01171-JSW, 2018 WL 8186605 (N.D. Cal. Oct. 30, 2018) ............................................................................................ 22
*Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754 (2011) ........................................ 15
*Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042 (C.D. Cal. July 13, 2015) ............................................................................ 22
*Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946 (N.D. Cal. 2009) .......................... 21
*Hernandez v. Spacelabs Med. Inc.*, 343 F.3d 1107 (9th Cir. 2003) .................................. 13

*Hough v. Carroll*, No. 2:24-cv-02886-WLH-SK, 2025 WL 1674425 (C.D. Cal. May 5, 2025) ........ 19
*In re First All. Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) ........ 13, 19
*James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915 (9th Cir. 2008) ........ 15
*JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098 (9th Cir. 2016) ........ 9
*Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571 (1995) ........ 13, 20
*Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705 (9th Cir. 2010) ........ 23
*Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242 (1966) ........ 18, 21
*Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328 (2014) ........ 19
*Neilson v. Union Bank of Cal., N.A.*, 290 F. Supp. 2d 1101 (C.D. Cal. 2003) ........ 15
*Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099 (9th Cir. 2000) ........ 12, 15
*Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380 (1993) ........ 7
*Preis v. Am. Indem. Co.*, 220 Cal. App. 3d 752 (1990) ........ 18
*Provenz v. Miller*, 102 F.3d 1478 (9th Cir. 1996) ........ 13
*Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1 (2024) ........ 21
*Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000) ........ 16
*R&R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240 (9th Cir. 2012) ........ 24
*RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089 (2017) ........ 13
*Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116 (2001) ........ 18, 21
*Salinas v. United States*, 522 U.S. 52 (1997) ........ 22
*Sanchez v. Sam's West, Inc.*, No. 2:21-cv-05122-SVW-JC, 2024 WL 4131841 (C.D. Cal. Feb. 9, 2024) ........ 24
*Sandoval v. County of San Diego*, 985 F.3d 657 (9th Cir. 2021) ........ 9
*Sands v. Eagle Oil & Ref. Co.*, 83 Cal. App. 2d 312 (1948) ........ 18, 21
*Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082 (N.D. Cal. 2013) . 13, 15, 20
*Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138 (C.D. Cal. 2016) ........ 22

*Tu Le v. Prestige Cmty. Credit Union*, No. 24-674, 2025 WL 1554413 (9th Cir. June 2, 2025) ........ 19

*United States v. Christensen*, 828 F.3d 763 (9th Cir. 2015) ........ 16, 22

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) (en banc) ........ 15

*United States v. Rogers*, 321 F.3d 1226 (9th Cir. 2003) ........ 13

*Upasani v. State Farm Gen. Ins. Co.*, 227 Cal. App. 4th 509 (2014) ........ 19

*VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472 (9th Cir. 1986) ........ 24

*Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434 (9th Cir. 1984) ........ 13

*Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773 (1979) ........ 13, 20

**Statutes**

Cal. Civ. Code § 2306 ........ 7, 17, 18

Cal. Civ. Code § 2334 ........ 17

**Rules and Orders**

Fed. R. Civ. P. 6(b)(1)(B) ........ 7

Fed. R. Civ. P. 26(a) ........ 23

Fed. R. Civ. P. 37(c)(1) ........ 17, 23

Fed. R. Civ. P. 56(c)(2) ........ 9

Fed. R. Civ. P. 56(d) ........ 7, 24, 26

Fed. R. Evid. 803(6), 1006 ........ 9

Civil Standing Order of Hon. Fred W. Slaughter ........ 7

**Other Authorities**

Restatement (Third) of Agency § 5.04 (2006) ........ 18

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

Defendants Fadi Elias, Jennifer Pope, and Classic Motors, Inc. (the "Elias Defendants") seek judgment on all six claims against them on one ground: they say they did not know that Alexander Ramos was stealing from Plaintiff Woodside Credit, LLC ("Woodside"). Their only evidence is their own word — two nearly identical declarations that attach no documents and do not identify a single vehicle, payment, or amount. State of mind is the classic jury question, and this record shows why.

Those declarations are some of Woodside's best evidence. Mr. Elias and Ms. Pope swear that Ramos told them the prices they paid for repossessed vehicles were "intentionally inflated"; that one purpose was to improve Woodside's standing with its partner banks "by representing to the banks that the repossessed vehicles were being sold at favorable prices"; that after each purchase money came back to them, not from Woodside but from a Montana entity styled "Agent for Montana Woodside Escrow Account"; that some of those payments were made out to Mr. Elias and one to Ms. Pope personally; and that twice they paid a second time for a vehicle they already owned so that the money could be returned to them. (Declaration of Fadi Elias (Dkt. 47-3) ("Elias Decl.") ¶¶ 7–9; Declaration of Jennifer Pope (Dkt. 47-2) ("Pope Decl.") ¶¶ 6–8.)

The money was Woodside's: approximately $1,419,803 in "refund" checks and wires, issued at Ramos's direction out of funds he had diverted from Woodside. (Declaration of Brian Trevisan, executed Aug. 21, 2026, filed with Dkt. 38 and re-filed herewith ("Trevisan Decl.") ¶¶ 3, 8.) The Elias Defendants admit buying approximately twenty-one vehicles. (Declaration of Geoffrey A. Neri ("Neri Decl.") Ex. B, RFA No. 11.) That is an average "refund" of more than $67,000 per vehicle — more than they say they paid for three of the four vehicles whose prices they have disclosed. (*Id.* Ex. D at 7–9.)

A jury could readily find that a dealer licensed for some twenty-five years — told that the stated price of each deal was a fiction for the banks' consumption, and paid back,

through an out-of-state side account, an average of more than $67,000 per vehicle — knew that the officer arranging it was not acting for his employer and was running a fraudulent scheme. Under California law, "[a]n agent can never have authority, either actual or ostensible, to do an act which is, and is known or suspected by the person with whom he deals, to be a fraud upon the principal." Cal. Civ. Code § 2306.

The motion fails for further reasons. The declarants are interested parties whom a jury need not believe. Indeed, to that end their sworn account conflicts with their own discovery responses. They refused to answer every interrogatory asking what Ramos told them, promised documents in thirty-two categories, and produced none. And they say nothing about four more vehicles that they admit having had and for which neither Woodside nor its partner banks received a dollar.

The motion should be denied. Alternatively, the Court should defer it under Rule 56(d) until the Elias Defendants produce the documents they promised and sit for deposition — relief Woodside has already requested in its pending motion to modify the Scheduling Order (Dkt. 37), set for hearing on September 24, 2026.[1]

[1] This Opposition is filed one day late. It was due September 17, 2026. (Dkt. 26; Civil Standing Order § IX.f.) Woodside's counsel calendared the deadline by counting back twenty-eight days from the October 15 hearing, and the computation mistakenly treated September as having thirty-one days. The error was counsel's and was inadvertent. (Neri Decl. ¶ 2.) Woodside respectfully requests that the Court excuse the one-day delay and consider this Opposition. *See* Fed. R. Civ. P. 6(b)(1)(B); *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993); *Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1255, 1261–62 (9th Cir. 2010) (summary judgment opposition filed three days late "due to a calendaring mistake and computer problems"; excusable neglect). The delay prejudices no one. The Scheduling Order measures the reply deadline from the filing of the opposition (Dkt. 26), Woodside does not oppose a corresponding extension of any reply deadline measured from the hearing date, and the hearing is twenty-seven days away.

## II. STATEMENT OF FACTS

### A. Woodside, Its Partner Banks, and Ramos

Woodside finances purchases of classic and collector cars. The loans it originates are owned by partner banks ("Partner Banks"), and when a borrower defaults Woodside handles the repossession and resale of the vehicle for the Partner Bank that owns the loan. (Trevisan Decl. ¶¶ 3–4; Elias Decl. ¶ 6.) The motion does not contend that Woodside authorized what follows. It argues only that the Elias Defendants were "unwitting pawns in Ramos's alleged scheme to steal from Plaintiff." (Mot. at 2.)

Ramos worked at Woodside from 2017 until October 2024, last as Assistant Vice President, Title & Risk Manager. He supervised disbursement of the tax, title, and licensing funds ("TT&L funds") that Woodside holds for its borrowers, and he handled most of Woodside's repossession sales. (Trevisan Decl. ¶ 3.) He used the first job to fund a scheme in the second. Ramos directed Woodside TT&L checks to a Montana title agent for borrowers with no connection to Montana, and then directed disbursements from the agent's account. (*Id.*) Some of the money went to a Chase account Ramos controlled, titled "Ramos-Woodside Credit, LLC." (*Id.* ¶¶ 8, 11.) And approximately $1,419,803 went to the Elias Defendants, in "refund" checks and wires issued at Ramos's direction. (*Id.* ¶ 8.) Woodside discovered the scheme in October 2024, terminated Ramos's access on October 18, 2024, and reported the theft to law enforcement. (*Id.* ¶ 3.) Ramos pleaded guilty in this Court to mail and wire fraud and is awaiting sentencing. *United States v. Ramos*, No. 8:25-cr-00106-FWS (C.D. Cal.), Dkt. 40 at 4–5.

### B. The Elias Defendants' Transactions With Ramos

Mr. Elias is the founder, owner, and president of Classic Motors (which gives its name as Classic Motor Inc.), a specialty dealer that held a California dealer license for approximately twenty-five years before moving to Arizona. (SUF 1–2; Neri Decl. Ex. E at 3.) Ms. Pope, his wife of twenty-three years, handles "paperwork for vehicle purchases," had signatory authority on Classic Motors' and Mr. Elias's bank accounts, and

communicated directly with Ramos. (Neri Decl. Ex. C, RFA Nos. 4, 6, 18; Ex. D at 5; Ex. E at 6.)

The Elias Defendants admit that between March 2023 and October 2024 they bought approximately twenty-one repossessed vehicles through Woodside, with Ramos as their point of contact. (Neri Decl. Ex. A, RFA Nos. 6, 13; Ex. B, RFA No. 11.) They admit reselling vehicles at a profit. (*Id.* Ex. A, RFA Nos. 23–24.) Woodside's schedule of the sales, attached to the Complaint and produced in discovery, lists twenty-one vehicles at stated prices totaling $1,801,000. (Neri Decl. ¶ 10 & Ex. J.)[2]

Over the same period the Montana agent paid them approximately $1,419,803. (Trevisan Decl. ¶ 8.) The Elias Defendants admit, among other payments, an $11,465 check to Mr. Elias personally dated March 15, 2023; a $30,000 check to Classic Motors dated July 18, 2023; a $35,000 check to Ms. Pope personally dated February 8, 2024; and wires to Classic Motors of $200,000, $100,000, and $55,000 within three weeks in July 2024. (Neri Decl. Ex. A, RFA No. 14; Ex. B, RFA Nos. 13–16; Ex. C, RFA No. 8.) They admit that checks said "Refund" on the memo line. (*Id.* Ex. A, RFA No. 17; Ex. B, RFA No. 18.) Woodside's schedule lists forty-eight payments: thirty-nine to Classic Motors, eight to Mr. Elias personally (totaling $135,247), and one to Ms. Pope. (*Id.* Ex. K.)

[2] Exhibits J and K to the Neri Declaration are Woodside's schedules of the vehicle sales and of the Montana agent's payments. They are Exhibits A and B to the Complaint, were identified in Woodside's initial disclosures, and were produced at WC000154 and WC000149. (Neri Decl. ¶ 10 & Ex. G at 4.) Woodside will present their contents at trial through Mr. Trevisan, who has already attested to the total of the payments (Trevisan Decl. ¶ 8), and through the underlying business and bank records. Fed. R. Evid. 803(6), 1006. They may be considered now. Fed. R. Civ. P. 56(c)(2); *Sandoval v. County of San Diego*, 985 F.3d 657, 666 (9th Cir. 2021) ("If the contents of a document can be presented in a form that would be admissible at trial—for example, through live testimony by the author of the document—the mere fact that the document itself might be excludable hearsay provides no basis for refusing to consider it on summary judgment."); *JL Beverage Co. v. Jim Beam Brands Co.*, 828 F.3d 1098, 1110 (9th Cir. 2016); *Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003). The facts on which this Opposition principally relies are independently admitted by the Elias Defendants or sworn in the Trevisan Declaration.

The payments do not look like refunds of overpayments. (1) Size. Approximately $1,419,803 across approximately twenty-one vehicles averages more than $67,000 per vehicle. The Elias Defendants say they paid $80,000, $55,000, $7,000, and $61,500 for the four vehicles whose prices they disclosed. (Neri Decl. Ex. D at 7–9.) Measured against the $1,801,000 in stated prices on Woodside's schedule, the payments returned seventy-nine percent. (*Id.* Exs. J–K.) (2) Timing. The $11,465 check to Mr. Elias is dated March 15, 2023 — eight days before he paid $80,000 for the Bentayga on March 23, 2023, the earliest sale on the schedule. (*Id.* Ex. A, RFA Nos. 9, 14; Ex. J.) Ms. Pope's $35,000 check is dated February 8, 2024, the day before the schedule shows the Aston Martin selling for $136,000. (*Id.* Ex. C, RFA No. 8; Ex. J.) (3) Amounts. On the schedule, thirty of the forty-eight payments are multiples of $5,000 — $35,000 eight times, $25,000 seven times, $40,000 four times — and payments outnumber purchases forty-eight to twenty-one. (*Id.* Exs. J–K.)

There is more. The Elias Defendants admit that four other repossessed vehicles — a 2019 Rolls Royce, a 2005 Rolls Royce Wraith, a 2020 Mercedes G Class, and a 1972 Chevrolet Chevelle — were in their possession, custody, or control. (Neri Decl. Ex. A, RFA No. 25; Ex. B, RFA No. 25; Ex. C, RFA No. 30.) Ms. Pope admitted a request describing them as vehicles "for which neither Woodside nor its PARTNER BANKS received any sale proceeds." (*Id.* Ex. C, RFA No. 30.) Woodside's schedule shows no sale price for any of them and original loan balances of more than $660,000. (*Id.* Ex. J.) Woodside has paid its Partner Banks more than $900,000 on repossession-sale and collateral transactions that Ramos corrupted. (Trevisan Decl. ¶¶ 4, 6(b).) The declarations do not mention these vehicles. Asked by interrogatory what became of them, Classic Motors refused to answer. (Neri Decl. Ex. E at 16.)

**C. The Elias Defendants' Discovery Responses**

On March 25, 2026, Woodside served each Elias Defendant with interrogatories, document requests, and requests for admission. (Neri Decl. ¶ 3.) The May 15 responses are

signed only by counsel; no verification has been served. (*Id.* ¶ 4.) Three features of the responses matter here.

(1) <u>The refusals</u>. Each defendant answered a few interrogatories and refused the rest on a numerosity objection. The refused interrogatories asked them to describe their communications with Ramos; to state what Ramos told them about the reason for each payment and why they "believed each such representation to be true"; to identify the accounts into which the payments went; to state their resale profits and whether any were shared with Ramos; and to account for the four vehicles. (*Id.* ¶ 5 & Ex. D at 9–19; Ex. E at 10–19; Ex. F at 11–19.)

(2) <u>The denials</u>. Woodside asked Mr. Elias and Classic Motors to admit that Ramos told them "that Woodside wanted the PARTNER BANKS to believe that automobiles were selling for higher prices than what they would actually sell for." Each responded that it was "unable to admit or deny this Request as phrased, and on that basis denies." (*Id.* Ex. A, RFA No. 8; Ex. B, RFA No. 19.) Mr. Elias also refused to answer the interrogatory asking what Ramos told him on that subject. (*Id.* Ex. D at 10–11.)

(3) <u>Ms. Pope's check</u>. Ms. Pope stated in May that she "did not know what the purpose of this payment was at the time" she received it, but that, "[b]ased on communications from Alexander Ramos," she "came to understand that Alexander Ramos mistakenly believed that [she] intended to personally retain the vehicle for personal use, and that the check was intended as a refund for overpayment." (*Id.* Ex. F at 7.) Her declaration says otherwise: she "did not and do[es] not know why" payments were made out to her or Mr. Elias, "and Ramos never explained this." (Pope Decl. ¶ 7.)

The Elias Defendants also committed in writing to produce documents in thirty-two categories "upon entry of a protective order," including their communications with Ramos. The Court entered the protective order on May 18, 2026. (Dkt. 35.) They have produced nothing. (Neri Decl. ¶ 6; Dkt. 37-2 ¶¶ 7, 9 & Ex. C.) Their initial disclosures list "[p]roof

of payments for vehicles and related documents"; none has been produced, and none accompanies the motion. (Neri Decl. ¶ 7 & Ex. H.)

## III. LEGAL STANDARD

A defendant moving for summary judgment "must either produce evidence negating an essential element of the nonmoving party's claim or defense or show that the nonmoving party does not have enough evidence of an essential element to carry its ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). It "may not require the nonmoving party to produce evidence supporting its claim or defense simply by saying that the nonmoving party has no such evidence." *Id.* at 1105. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor," and "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## IV. ARGUMENT

### A. Knowledge and Intent Are Disputed Questions of Fact

#### *1. State of Mind Is Proven by Circumstantial Evidence and Decided by Juries*

Every ground of the motion is the same: the Elias Defendants did not know what Ramos was doing and did not intend to help him. (Mot. at 1–2.) "Questions involving a person's state of mind . . . are generally factual issues inappropriate for resolution by summary judgment." *Braxton-Secret v. A.H. Robins Co.*, 769 F.2d 528, 531 (9th Cir. 1985). "Summary judgment is generally inappropriate when mental state is an issue, unless no reasonable inference supports the adverse party's claim." *Vucinich v. Paine, Webber, Jackson & Curtis, Inc.*, 739 F.2d 1434, 1436 (9th Cir. 1984); *accord Provenz v. Miller*, 102 F.3d 1478, 1489 (9th Cir. 1996). The motion's own authority says so: "What-did-he-know-and-when-did-he-know-it questions are often difficult to answer, and for that reason are often inappropriate for resolution on summary judgment." *Hernandez v. Spacelabs Med.*

*Inc.*, 343 F.3d 1107, 1113–14 (9th Cir. 2003) (reversing summary judgment) (cited at Mot. at 6).

Knowledge is rarely proven by confession. The "actual knowledge" California requires may be, and usually is, proven circumstantially. (1) "Actual knowledge can, and often is, shown by inference from circumstantial evidence." *RSB Vineyards, LLC v. Orsi*, 15 Cal. App. 5th 1089, 1097–98 (2017); *Simi Mgmt. Corp. v. Bank of Am., N.A.*, 930 F. Supp. 2d 1082, 1099 (N.D. Cal. 2013) ("A plaintiff may prove actual knowledge through inference or circumstantial evidence."). (2) A case the Elias Defendants themselves cite affirmed a jury's finding of actual knowledge on circumstantial evidence: that the defendant "came upon red flags which were seemingly ignored was enough to establish actual knowledge under the California aiding and abetting standard." *In re First All. Mortg. Co.*, 471 F.3d 977, 994, 999 (9th Cir. 2006). (3) A conspirator's "requisite concurrence and knowledge" likewise "may be inferred from the nature of the acts done, the relation of the parties, the interests of the alleged conspirators, and other circumstances," and "[t]acit consent as well as express approval will suffice." *Wyatt v. Union Mortg. Co.*, 24 Cal. 3d 773, 785 (1979) (citation and internal quotation marks omitted); *accord Kidron v. Movie Acquisition Corp.*, 40 Cal. App. 4th 1571, 1582 (1995). (4) So may intent to defraud under the mail and wire fraud statutes. *United States v. Rogers*, 321 F.3d 1226, 1230 (9th Cir. 2003).

### *2. The Record Supports the Inference That the Elias Defendants Knew*

Start with their own account. They say an officer of a finance company told them that the prices on the company's repossession sales were "intentionally inflated," in part so the company could tell the banks that owned the loans that the vehicles "were being sold at favorable prices." (Elias Decl. ¶ 7; Pope Decl. ¶ 6.) A person told that has been told that the paperwork is false and that someone is being deceived. The Elias Defendants went ahead — twenty-one times. The motion answers that any deception was aimed at the banks, and Woodside cannot sue for them. (Mot. at 7–8 n.3.) Woodside is not suing for the banks. The

admission shows the Elias Defendants' state of mind: they knew the transactions were dishonest, knew Ramos was arranging them, and took the money. A jury may infer that a dealer who knowingly joins a lender's officer in deceiving the lender's banks also understood that the officer was not faithfully serving the lender.[3]

Then follow the money. (1) Amount. The payments average more than $67,000 per vehicle, and equal seventy-nine percent of the stated prices on Woodside's schedule. Sellers do not return four-fifths of the price. (2) Source. A true refund would come from whoever was overpaid. These payments came from a title agent in Montana, on checks drawn on an "escrow account," from an entity with which Ms. Pope admits she had no business relationship. (Elias Decl. ¶ 8; Neri Decl. Ex. C, RFA No. 29.) (3) Payees. The buyer was Classic Motors. (Neri Decl. Ex. D at 7–9.) Checks were made out to Mr. Elias personally and to his wife (Elias Decl. ¶ 8) — eight to him, totaling $135,247, on Woodside's schedule (Neri Decl. Ex. K). (4) Timing and amounts. Payments preceded purchases, outnumbered them two to one, and came in round numbers. (*Id.* Ex. A, RFA Nos. 9, 14; Exs. J–K.) (5) The double payments. Twice, Classic Motors "re-issue[d] payment for an already-purchased vehicle" on the understanding that the money would come back. (Elias Decl. ¶ 9.) Paying again for a car one already owns has no commercial purpose the Elias Defendants have identified. (6) The resales. The Elias Defendants admit they resold these vehicles at a profit, and they refused to say for how much. (Neri Decl. Ex. A, RFA No. 24; Ex. D at 9.) If they resold at anything near the stated prices, there was no overpayment to refund, and they knew it. "[T]ransactions lacking business justification" support an inference of actual knowledge. *Simi*, 930 F. Supp. 2d at 1099; *accord Neilson v. Union Bank of Cal., N.A.*, 290

[3] Nor does it matter to the RICO claims who received the misrepresentations. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (plaintiff "need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations"). Woodside's injury is direct: its diverted funds paid the "refunds." (Trevisan Decl. ¶ 8.)

F. Supp. 2d 1101, 1120 (C.D. Cal. 2003) (atypical procedures "rais[e] an inference that they knew of the . . . scheme and sought to accommodate it").

Finally, the four vehicles. The Elias Defendants' story is about purchases they paid for. It does not explain how they came to possess four more vehicles, on loans with original balances over $660,000, for which no proceeds reached Woodside or a Partner Bank. (Neri Decl. Ex. A, RFA No. 25; Ex. C, RFA No. 30; Ex. J.) Their declarations are silent, and when Woodside asked, they refused to answer. (Neri Decl. Ex. E at 16.) Summary judgment cannot be granted on claims arising from transactions the moving papers do not address. *Nissan Fire*, 210 F.3d at 1102–03; *James River Ins. Co. v. Hebert Schenk, P.C.*, 523 F.3d 915, 923–24 (9th Cir. 2008) (reversing where the motion did not reach the nonmovant's theory).

From these facts a jury could find that the Elias Defendants knew Ramos was diverting his employer's money to them, and chose to keep taking it. The implausibility of the belief they profess is itself evidence that they did not hold it. At a minimum, a jury could find willful blindness, which under the federal statutes on which the RICO claims rest is knowledge, too: "(1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011); *United States v. Heredia*, 483 F.3d 913, 922 n.13 (9th Cir. 2007) (en banc) ("willful blindness is tantamount to knowledge"). Both parts are met on the Elias Defendants' own account. They were told the prices were fictitious, and the money came back from a Montana "escrow" account, sometimes to them personally. Yet in nineteen months their declarations describe no inquiry of anyone at Woodside but Ramos — not even the loan representative they had dealt with for years. (SUF 6–7.)

### ***3. The Declarations Cannot Carry the Motion***

Against this the Elias Defendants offer only their own denials. That is not enough.

(1) They are interested witnesses. The Court "must disregard all evidence favorable to the moving party that the jury is not required to believe," crediting the movant's evidence only where it is "uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (citation omitted). A jury is not required to believe a defendant's account of his own state of mind. The motion's lead RICO case says so of a participant who testified to an innocent understanding of what his principal was doing: "a reasonable jury would not be required to credit this testimony." *United States v. Christensen*, 828 F.3d 763, 781 (9th Cir. 2015).

(2) They are impeached by their own discovery responses. In May, Mr. Elias and Classic Motors denied that Ramos told them Woodside wanted the banks to believe vehicles were selling for higher prices. (Neri Decl. Ex. A, RFA No. 8; Ex. B, RFA No. 19.) In September they swore he said just that. (Elias Decl. ¶ 7.) In May, Ms. Pope said Ramos explained her $35,000 check as a mistake about who was keeping a car. (Neri Decl. Ex. F at 7.) In September she swore "Ramos never explained this." (Pope Decl. ¶ 7.) She also denies that the check had anything to do with the Aston Martin sold the next day (Neri Decl. Ex. C, RFA No. 11), which leaves it with no explanation at all. Which account is true is for the jury. *Anderson*, 477 U.S. at 255.

(3) The declarations are untested because the Elias Defendants made sure of it. They recite, in general terms and without identifying a single communication or document, what Ramos "continually and consistently represented." (Elias Decl. ¶ 7.) Those are the communications the Elias Defendants refused to describe in response to interrogatories, and the documents they promised and withheld. (Neri Decl. ¶¶ 5–6.) The motion itself insists that evidence "not timely disclosed or produced during discovery" cannot be considered on summary judgment. (Mot. at 7 (citing Fed. R. Civ. P. 37(c)(1)).) By that standard the declarations fall first.

(4) The declarations are careful where they should be clear. They say the account to which Classic Motors sent its payments had a name that "included the name 'Woodside Credit, LLC.'" (Elias Decl. ¶ 8; Pope Decl. ¶ 7.) They do not say what else the name included, and they attach no check, wire confirmation, or statement. Ramos controlled a Chase account titled "Ramos-Woodside Credit, LLC." (Trevisan Decl. ¶¶ 8, 11.) If the Elias Defendants paid an account with Ramos's name on it, that is further evidence of knowledge; if they did not, their bank records would show it. They have produced none.

**B. Ramos's Title Is Not a Defense**

The motion's refrain is that Ramos was Woodside's "executive officer," so whatever the Elias Defendants told Ramos they told Woodside, and whatever Ramos approved Woodside approved. (Mot. at 9–10.) California law is to the contrary.

(1) Authority. An agent "can never have authority, either actual or ostensible," to do an act "known or suspected by the person with whom he deals, to be a fraud upon the principal." Cal. Civ. Code § 2306. Suspicion is enough. And ostensible authority protects only those who dealt with the agent "in good faith, and without want of ordinary care." *Id.* § 2334. It also must rest on what the principal did: "Ostensible authority must be established through the acts or declarations of the principal and not the acts or declarations of the agent." *Preis v. Am. Indem. Co.*, 220 Cal. App. 3d 752, 761 (1990). The motion points to nothing Woodside said or did — only to what Ramos said about himself. (SUF 14–17.)

(2) Imputation. "A corporation is not chargeable with the knowledge of an officer who collaborates with an outsider to defraud it," and "[i]t would be a strange doctrine . . . that exonerated the corporation of the knowledge of the officer acting adversely to it but charged it with the knowledge of his confederate." *Meyer v. Glenmoor Homes, Inc.*, 246 Cal. App. 2d 242, 264–65 (1966); *accord Sands v. Eagle Oil & Ref. Co.*, 83 Cal. App. 2d 312, 319–20 (1948) ("if the agent and the third party act in collusion against the principal the principal will not be held bound by the knowledge of the agent"); Restatement (Third) of Agency § 5.04 (2006) (third party who deals through an agent "knowing or having reason

to know that the agent acts adversely to the principal, does not deal in good faith"). The rule reaches the top of the company. *Saks v. Charity Mission Baptist Church*, 90 Cal. App. 4th 1116, 1138–40 (2001) (applying § 2306 and *Meyer* to a corporation's president: "There is nothing fair or equitable about permitting a third party to attribute a corporate employee's acts to the corporation where the third party is engaged in a conspiracy with the employee to use the corporation to obtain a benefit for himself.").

The defense therefore assumes its conclusion. Ramos's title helps the Elias Defendants only if they dealt with him in good faith and without suspicion. Whether they did is the disputed fact. That no one else at Woodside warned them (SUF 30) shows only that Ramos hid the scheme from Woodside until October 2024 (Trevisan Decl. ¶ 3) — which is why there is a lawsuit.

**C. <u>Each Claim Presents Triable Issues</u>**

***1. Aiding and Abetting Fraud and Breach of Fiduciary Duty (Second and Fifth Claims)***

Aiding and abetting requires actual knowledge of the primary wrong and substantial assistance; it does not require that the defendant owe the plaintiff a duty. *Casey v. U.S. Bank Nat'l Ass'n*, 127 Cal. App. 4th 1138, 1144–46 (2005); *Am. Master Lease LLC v. Idanta Partners, Ltd.*, 225 Cal. App. 4th 1451, 1475–78 (2014). The motion adds a third element, a "conscious decision to participate . . . for the purpose of assisting" (Mot. at 11), taken from a footnote in a case where aiding and abetting was "not pleaded." *Berg & Berg Enters., LLC v. Sherwood Partners, Inc.*, 131 Cal. App. 4th 802, 823 n.10 (2005). The Ninth Circuit has rejected it: California aiding and abetting "requires a finding of actual knowledge, not specific intent." *First All.*, 471 F.3d at 993. So have the motion's own cases. *Hough v. Carroll*, No. 2:24-cv-02886-WLH-SK, 2025 WL 1674425, at *6 n.4 (C.D. Cal. May 5, 2025) (the "purported element appears redundant with the knowledge element"); *Nasrawi v. Buck Consultants LLC*, 231 Cal. App. 4th 328, 345 (2014) ("We need not decide whether specific intent is a required element . . . ."). And the motion turns *Upasani* around (Mot. at

12). What that court said is that "[a] defendant who acts with actual knowledge of the intentional wrong to be committed and provides substantial assistance to the primary wrongdoer is not an accidental participant in the enterprise." *Upasani v. State Farm Gen. Ins. Co.*, 227 Cal. App. 4th 509, 519 (2014). In any event, one who knows the money is stolen and accepts it forty-eight times has made a conscious decision to participate.

The motion's knowledge cases are bank cases. *Casey* was a pleading ruling resting on "the sensitive context of a claim against a bank." 127 Cal. App. 4th at 1152. Its banks allegedly "knew something fishy was going on" but "were ignorant of the source of the funds"; the court added that knowledge the fiduciaries "were stealing corporate funds" "would suffice." *Id.* at 1149, 1151–52. *Hough* dismissed claims against three banks with leave to amend. 2025 WL 1674425, at *11. *Tu Le* is an unpublished memorandum affirming judgment for a credit union "where the perpetrators of the scheme deposited the plaintiffs' funds," on red flags that "perhaps suggest" it "should have known." *Tu Le v. Prestige Cmty. Credit Union*, No. 24-674, 2025 WL 1554413, at *1 (9th Cir. June 2, 2025). None of those defendants was told that the transaction prices were fictitious, and none was the payee. The Elias Defendants were the counterparty to every transaction and the recipient of every payment. They knew Ramos was a Woodside officer. (Neri Decl. Ex. A, RFA No. 19.) And they knew whose money it was: the motion itself calls the payments "Partial Refunds Received from Plaintiff." (Mot. at 3; *see* Neri Decl. Ex. A, RFA No. 20.) That is the knowledge *Casey* found missing.

*Simi* denied a bank summary judgment on evidence of the same kind. A dealership's chief financial officer embezzled through cashier's checks, checks made out to "cash," and transactions kept under $10,000. Those facts "could lead a jury to reasonably infer that [the bank] knew that [he] was embezzling Plaintiff's funds," and the bank's knowledge that he "was Plaintiff's CFO . . . could also add to a reasonable inference of actual knowledge of [his] breach of fiduciary duty." 930 F. Supp. 2d at 1100. Ramos's title, on which the motion leans, cuts the same way.

### *2. Conspiracy (Third Claim)*

Conspiracy requires knowledge of the wrongful plan and agreement to it, express or tacit. *Wyatt*, 24 Cal. 3d at 785; *Kidron*, 40 Cal. App. 4th at 1582. Agreement is inferred from "the nature of the acts done, the relation of the parties, [and] the interests of the alleged conspirators." *Wyatt*, 24 Cal. 3d at 785. Here there were nineteen months of coordinated dealing between the same parties; a division of labor in which Ramos supplied vehicles, bank approvals, and money and the Elias Defendants supplied the buyer, the bank accounts, and the resale; and interests that coincided, since every dollar paid to the Elias Defendants lowered their cost of vehicles they resold for profit. The motion's principal cases were nonsuits after trial, on records with "no evidence of a meeting of the minds." (Mot. at 13–14 (citing *Choate*, *IIG Wireless*, and *Kidron*).) Those plaintiffs reached a jury. And forty-eight payments are evidence of a meeting of the minds.

### *3. Fraudulent Concealment (First Claim)*

The motion argues that the Elias Defendants concealed nothing because everything was known to Ramos. (Mot. at 9–10.) *Meyer*, *Sands*, and *Saks* dispose of that: disclosure to a confederate is not disclosure to his principal. A duty to disclose arises where "the material facts are known or accessible only to defendant, and defendant knows those facts are not known or reasonably discoverable by plaintiff," or where "defendant actively conceals discovery of material fact from plaintiff," so long as the parties have a relationship "such as 'between seller and buyer.'" *Rattagan v. Uber Techs., Inc.*, 17 Cal. 5th 1, 40 (2024). The Elias Defendants were buyers in direct dealings with Woodside — they admit buying the vehicles "from or through Woodside Credit" (Neri Decl. Ex. A, RFA No. 13) — while receiving $1.4 million of Woodside's diverted funds through a side channel that ran outside Woodside, from a title agent in Montana. (Trevisan Decl. ¶¶ 3, 8.) Woodside did not learn of it until October 2024. (*Id.* ¶ 3.) If they knew Ramos was acting for himself, as a jury could find, then they knew Woodside did not know. Intent to defraud is inferred from the same circumstances, and the motion's own case calls it "a fact question that goes to the

defendant's state of mind." *Gutierrez v. Wells Fargo & Co.*, 622 F. Supp. 2d 946, 958 (N.D. Cal. 2009) (denying summary judgment). Whatever their own duty, they also answer for Ramos's concealment as his aiders and abettors — a theory with "no overlaid requirement of an independent duty." *Berg & Berg*, 131 Cal. App. 4th at 823 n.10.

### *4. RICO (Sixth and Seventh Claims)*

The motion attacks the RICO claims on one ground: that the Elias Defendants lacked a "common purpose" with Ramos and knowledge of the enterprise. (Mot. at 16–18.) An association-in-fact enterprise needs only "a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle v. United States*, 556 U.S. 938, 946 (2009). The purpose here was to move Woodside's money to Ramos and the Elias Defendants through repossession sales; the relationships and the nineteen-month run are undisputed.

The motion's lead case cuts against it. *Christensen* affirmed the RICO convictions of participants who claimed limited knowledge. "[I]t is sufficient that the defendant know the general nature of the enterprise and know that the enterprise extends beyond his individual role," and § 1962(d) "requires only" awareness of the enterprise's "essential nature and scope." 828 F.3d at 780. The motion quotes that language without the words "requires only." (Mot. at 16–17.) The common purpose there was "earning income," shown by evidence that the principal "paid [the defendants] for their roles in the enterprise." *Id.* at 781. A RICO conspirator need not know "all of the details of the plan," *Baumer v. Pachl*, 8 F.3d 1341, 1346–47 (9th Cir. 1993) (cited at Mot. at 17), or commit the predicate acts himself; "it suffices that he adopt the goal of furthering or facilitating the criminal endeavor." *Salinas v. United States*, 522 U.S. 52, 65 (1997). The essential nature of this enterprise was simple: Woodside's money went out through Ramos and came to the Elias Defendants. They knew that much, because they received it. Whether they knew Ramos lacked authority is the knowledge question addressed in Section IV.A, and willful blindness answers it as well as actual knowledge does.

The "individual economic interests" cases (Mot. at 16) involved vendors who supplied "routine" services at arm's length to a business whose fraud was "[c]ompletely unbeknownst" to them. *Gomez v. Guthy-Renker, LLC*, No. EDCV 14-01425 JGB (KKx), 2015 WL 4270042, at *5, *9 (C.D. Cal. July 13, 2015); *Gilbert v. MoneyMutual, LLC*, No. 13-cv-01171-JSW, 2018 WL 8186605, at *13–14 (N.D. Cal. Oct. 30, 2018) (designated "NOT FOR CITATION") (no evidence the defendants knew the lenders' conduct was unlawful). Here the victim's money went to the defendants themselves. Their economic interest was the scheme: the payments were their profit. This District has denied summary judgment to defendants making the same argument. *Tatung Co. v. Shu Tze Hsu*, 217 F. Supp. 3d 1138, 1172–73 (C.D. Cal. 2016) (rejecting argument that a "commercial business relationship" negated knowledge; intent "can be inferred from the words, actions, or interdependence of activities and persons involved").

**D. <u>Rule 37(c)(1) Provides No Basis for Judgment</u>**

In a string cite and a footnote, the motion suggests that Woodside's evidence may be disregarded because Woodside produced no documents before the discovery cut-off. (Mot. at 7, 12 n.4.) It may not.

(1) Rule 37(c)(1) applies where a party "fails to provide information or identify a witness as required by Rule 26(a) or (e)." Woodside's January 15, 2026 disclosures identified Mr. Trevisan; the Montana agent's bank records; the "48 checks and wires . . . totaling $1,419,803"; the "21 vehicle purchases . . . totaling $1,801,000"; and the two schedules now submitted as Exhibits J and K to the Neri Declaration, which have been Exhibits A and B to the Complaint since September 2025. (Neri Decl. ¶¶ 7, 10 & Ex. G at 2, 4; Dkt. 1 at 20–23.) Mr. Trevisan's declaration has been on the docket since August 24, 2026. Rule 26(a)(1)(A)(ii) permits "a description by category and location." The remedy for an unfulfilled document request is a motion to compel. The Elias Defendants never made one, and never wrote to ask for the documents. (Neri Decl. ¶ 8.)

(2) Any failure was harmless. The payments are the Elias Defendants' own checks and wires, the purchases are their own purchases, and the rest of this Opposition rests on their declarations and discovery responses. There is no surprise, no prejudice, and no disruption of a trial more than four months away; Woodside produced its documents on September 10, 2026. (*Id.*) *See Lanard Toys Ltd. v. Novelty, Inc.*, 375 F. App'x 705, 713 (9th Cir. 2010).

(3) Where exclusion "amount[s] to dismissal of a claim," the Court must consider "whether the claimed noncompliance involved willfulness, fault, or bad faith" and "the availability of lesser sanctions." *R&R Sails, Inc. v. Ins. Co. of Pa.*, 673 F.3d 1240, 1247 (9th Cir. 2012). The motion makes no such showing.

(4) The motion's two cases show the difference. *Chisolm* excluded a witness the plaintiff "never disclosed" and an email she did not produce "with her initial disclosures" or by supplementing them. *Chisolm v. 7-Eleven, Inc.*, 383 F. Supp. 3d 1032, 1045 (S.D. Cal. 2019). *Sanchez* found a late production willful and still refused exclusion as "too harsh a remedy," ordering a deposition instead. *Sanchez v. Sam's West, Inc.*, No. 2:21-cv-05122-SVW-JC, 2024 WL 4131841, at *11–12 (C.D. Cal. Feb. 9, 2024). More discovery, not exclusion, is the remedy — and it is what Woodside has asked for. (Dkt. 37.)

**E. <u>Alternatively, the Court Should Defer or Deny the Motion Under Rule 56(d)</u>**

If the Court concludes that the present record does not foreclose summary judgment, it should defer or deny the motion under Rule 56(d). Summary judgment presupposes "adequate time for discovery," *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) — words the motion leaves out when it quotes that sentence (Mot. at 6). The requesting party must show that "(1) it has set forth in affidavit form the specific facts it hopes to elicit from further discovery; (2) the facts sought exist; and (3) the sought-after facts are essential to oppose summary judgment." *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 525 F.3d 822, 827 (9th Cir. 2008). Denial of such relief is "especially inappropriate

where the material sought is also the subject of outstanding discovery requests." *VISA Int'l Serv. Ass'n v. Bankcard Holders of Am.*, 784 F.2d 1472, 1475 (9th Cir. 1986).

The Neri Declaration makes that showing. (1) Specific facts. Woodside seeks (a) the deposit and disposition of the payments, including whether any of the money went back to Ramos; (b) what the Elias Defendants paid for each vehicle, to whom, and into what account, including the "re-issued" payments and the account whose name "included" Woodside's; (c) their communications with Ramos and the Montana agent; (d) the acquisition and disposition of the four vehicles; (e) resale prices and profits; and (f) the depositions of Mr. Elias, Ms. Pope, and Classic Motors. (Neri Decl. ¶ 13.) (2) The facts exist. The Elias Defendants promised in writing to produce documents in thirty-two categories, and their initial disclosures list their "[p]roof of payments." (*Id.* ¶¶ 6–7.) (3) The facts are essential. The motion turns entirely on what the Elias Defendants knew, believed, and intended. Their contemporaneous communications and bank records, and cross-examination, are the ordinary means of testing a declaration that says "I believed him."

Woodside did not sit on its rights. It served this discovery fifteen weeks before the cut-off, received written commitments to produce, and satisfied their one condition within days. The Elias Defendants first refused to perform a month after the cut-off, and Woodside moved to modify the schedule thirteen days later. (Dkt. 37-2 ¶¶ 4–17.) That motion will be heard three weeks before this one. If it is granted, this motion should be deferred until the discovery is complete. (Dkt. 37-3 ¶ 5.) Another court in this District, facing the same sequence, did just that. *FeedMe Trading LLC v. My Fish Stop LLC*, No. CV 23-08857-MWF (JCx), 2024 WL 5257016, at *2, *4 (C.D. Cal. Oct. 10, 2024). A party should not obtain summary judgment on its own say-so after promising, and then withholding, the evidence that would test it.

## V. CONCLUSION

The motion should be denied in its entirety. Alternatively, the Court should defer the motion under Rule 56(d) until the Elias Defendants have produced the documents they committed to produce and have been deposed.

Respectfully submitted,

DATED: September 18, 2026

BROWN NERI SMITH & KHAN LLP

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri
Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel of record for Plaintiff Woodside Credit, LLC, certifies that this brief contains 6,930 words, which complies with the word limit of L.R. 11-6.1.

DATED: September 18, 2026

BROWN NERI SMITH & KHAN LLP

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri
Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**DECLARATION OF GEOFFREY A. NERI PURSUANT TO CIVIL STANDING ORDER § VIII.h**

I, Geoffrey A. Neri, declare as follows:

1. I am an attorney admitted to practice before this Court and counsel of record for Plaintiff Woodside Credit, LLC. I make this declaration pursuant to Section VIII.h of the Court's Civil Standing Order. I have personal knowledge of the facts stated below.

2. Generative artificial intelligence was used to assist in preparing portions of the foregoing Opposition and the Statement of Genuine Disputes, Evidentiary Objections, and Declaration of Geoffrey A. Neri filed with it.

3. I have reviewed the source material on which those filings rely, including the authorities, the record, and the exhibits cited in them, and I have verified that the content generated with the assistance of artificial intelligence is accurate and complies with my obligations under Federal Rule of Civil Procedure 11.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on September 18, 2026, at Los Angeles, California.

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri