Geoffrey Neri (SBN 258802)
Geoff@bnsklaw.com
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

WOODSIDE CREDIT, LLC, a California limited liability company,

Plaintiff,

vs.

ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,

Defendants.

Case No. 8:25-cv-02146-FWS-JDE

**PLAINTIFF WOODSIDE CREDIT, LLC'S STATEMENT OF GENUINE DISPUTES AND ADDITIONAL MATERIAL FACTS IN OPPOSITION TO DEFENDANTS FADI ELIAS, JENNIFER POPE, AND CLASSIC MOTORS, INC.'S MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION**

[Filed concurrently with Opposition; Declaration of Geoffrey A. Neri and exhibits thereto; Declaration of Brian Trevisan; and Evidentiary Objections]

Date: October 15, 2026
Time: 10:00 a.m.
Crtrm.: 10A

Complaint Filed: Sept. 22, 2025
Trial Date: February 2, 2027

## STATEMENT OF GENUINE DISPUTES

Pursuant to Local Rule 56-2 and Section IX.f of the Court's Civil Standing Order, Plaintiff Woodside Credit, LLC ("Woodside") submits this Statement of Genuine Disputes in response to the Statement of Undisputed Facts (Dkt. 47-1) ("SUF") filed by Defendants Fadi Elias, Jennifer Pope, and Classic Motors, Inc. (the "Elias Defendants"), followed by Woodside's Additional Material Facts ("AMF"), numbered sequentially from 31. "Neri Decl." refers to the Declaration of Geoffrey A. Neri filed with Woodside's Opposition. "Trevisan Decl." refers to the Declaration of Brian Trevisan executed August 21, 2026, filed with Dkt. 38 and re-filed with Woodside's Opposition. Exhibits J and K to the Neri Declaration are Woodside's schedules of the vehicle sales and of the Montana agent's payments (Exhibits A and B to the Complaint), the contents of which Woodside will present at trial through Mr. Trevisan and the underlying records. Fed. R. Civ. P. 56(c)(2); Fed. R. Evid. 803(6), 1006.

Responses marked "Disputed (Credibility/Rule 56(d))" incorporate the following. The fact rests solely on the declarations of Mr. Elias and Ms. Pope, interested parties testifying to their own uncorroborated communications with Ramos and to their own state of mind. A jury is not required to believe that testimony. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The declarations attach no documents, identify no dates or specifics, and conflict with the declarants' discovery responses. (AMF 55–59, 64.) The Elias Defendants refused to answer interrogatories on these subjects, produced none of the documents they committed to produce, and have not been deposed. (AMF 60–63; Neri Decl. ¶¶ 5–6, 11, 13.) Fed. R. Civ. P. 56(d).

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| 1. Defendant Fadi Elias is, and at all relevant times was, the founder, owner, and president of Classic Motor, Inc. | **Undisputed.** |

| **Elias Defendants' Undisputed Facts and Supporting Evidence** | **Woodside's Response and Supporting Evidence** |
|---|---|
| Supporting Evidence: Declaration of Fadi Elias ("Elias Decl.") ¶ 1. Declaration of Jennifer Pope ("Pope Decl.") ¶ 1. | |
| 2. Classic Motor, Inc. is a specialty vehicle dealer engaged in the business of buying and selling classic and other collector cars.<br>Supporting Evidence: Elias Decl. ¶ 2. Pope Decl. ¶ 2. | **Undisputed.** |
| 3. Defendant Jennifer Pope is Fadi Elias's wife.<br>Supporting Evidence: Elias Decl. ¶ 1. Pope Decl. ¶ 1. | **Undisputed.** |
| 4. Jennifer Pope assists with tasks related to the management of Classic Motor, Inc.<br>Supporting Evidence: Elias Decl. ¶ 3. Pope Decl. ¶ 3. | **Undisputed.** *See also* AMF 49. |
| 5. Jennifer Pope is an employee but not an officer of Classic Motor, Inc.<br>Supporting Evidence: Elias Decl. ¶ 3. Pope Decl. ¶ 3. | **Undisputed** for purposes of this motion. |
| 6. Classic Motor, through Mr. Elias, worked with Plaintiff for many years prior to 2021, during which time Plaintiff was Classic Motor's preferred lender for vehicle transactions that required financing.<br>Supporting Evidence: Elias Decl. ¶ 4. | **Undisputed** for purposes of this motion that Classic Motors did business with Woodside before 2021. Which lender Classic Motors "preferred" is immaterial. |
| 7. In 2021, Mr. Elias spoke to Scott Steckel, who was then the loan | **Undisputed** for purposes of this motion. |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| representative for Plaintiff working with Classic Motor.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 4. | |
| 8. Mr. Elias expressed interest to Scott Steckel in Classic Motor becoming eligible to purchase vehicles that were the subject of delinquent loans and were consequently repossessed and put up for sale by Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 4. | **Undisputed** for purposes of this motion. |
| 9. Mr. Steckel advised Mr. Elias that Alexander Ramos was the officer for Plaintiff in charge of sales and repossessed vehicles.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 5. | **Undisputed** for purposes of this motion. |
| 10. Mr. Steckel introduced Mr. Elias to Ramos.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 5. | **Undisputed** for purposes of this motion. |
| 11. Mr. Elias and Ms. Pope were informed and understood that Ramos was an executive officer for Plaintiff, specifically its Vice President for Title and Risk Management.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 5. Pope Decl. ¶ 4. | **Undisputed** that the Elias Defendants knew Ramos was employed by Woodside and held the title Assistant Vice President, Title & Risk Manager. (AMF 50.) **Disputed** to the extent the fact implies that Ramos had authority to arrange the transactions described in SUF 14–27. (Cal. Civ. Code §§ 2306, 2334; AMF 32–34.) |
| 12. Following Mr. Elias's introduction to Ramos, Ramos began to facilitate the sale of repossessed vehicles to Classic Motor, on behalf of Plaintiff or its partner banks.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 6. | **Undisputed** that Ramos handled sales of repossessed vehicles to Classic Motors. **Disputed** that, in arranging sales on the terms described in SUF 14–27, Ramos acted "on behalf of Plaintiff or its partner banks." The payments to the Elias |

| **Elias Defendants' Undisputed Facts and Supporting Evidence** | **Woodside's Response and Supporting Evidence** |
|---|---|
| | Defendants were made at Ramos's direction out of funds he diverted from Woodside, and the motion itself describes Ramos's conduct as a "scheme to steal from Plaintiff." (AMF 32–34; Mot. at 2.) *See* Evidentiary Objection No. 4. |
| 13. In facilitating the vehicle sales, Ramos would notify Mr. Elias, or Mr. Elias and Ms. Pope, that a particular vehicle Plaintiff had repossessed was being made available for purchase, and would provide them with details including the vehicle's make, model, year, and mileage, as well as a purchase price.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 7. Pope Decl. ¶ 6. | **Undisputed** for purposes of this motion that Ramos communicated with Mr. Elias and Ms. Pope about vehicles and prices. The content of those communications is known only to the Elias Defendants and Ramos; the Elias Defendants refused to describe them in discovery and have produced none of them. (AMF 60, 62; Neri Decl. ¶¶ 5–6, 13.) Fed. R. Civ. P. 56(d). |
| 14. Ramos stated and represented that these purchase prices were intentionally inflated as part of a business determination by Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 7. Pope Decl. ¶ 6. | **Undisputed** that the Elias Defendants knew the stated purchase prices were "intentionally inflated." (Elias Decl. ¶ 7; Pope Decl. ¶ 6.)<br><br>**Disputed (Credibility/Rule 56(d)).** Woodside disputes that Ramos represented the inflated prices to be "a business determination by Plaintiff," and disputes that the Elias Defendants believed any such representation. The "refund" payments were made at Ramos's direction out of funds he diverted from Woodside. (AMF 33.) Mr. Elias and Classic Motors denied a request to admit a statement by Ramos on this subject. (AMF 55.) *See* Evidentiary Objection Nos. 1, 6. |
| 15. Ramos stated and represented that that, after Classic Motor or Mr. Elias on its | **Disputed (Credibility/Rule 56(d)).** The payments do not correspond to any |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| behalf made the requested payment, Classic Motor or Mr. Elias on its behalf would be reimbursed for the amount by which Ramos, on Plaintiff's behalf, determined they had overpaid.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 7. Pope Decl. ¶ 6. | determination of an "overpayment": they average more than $67,000 per vehicle and total 79 percent of the stated prices on Woodside's schedule, outnumber the purchases forty-eight to twenty-one, are mostly round numbers, and in some instances precede the purchase. (AMF 37–40, 44–46.) They were made at Ramos's direction out of funds he diverted from Woodside. (AMF 33.) *See* Evidentiary Objection Nos. 1, 6. |
| 16. Ramos stated and represented to Mr. Elias and Ms. Pope that the reason for Plaintiff's inflated requested purchase prices was sometimes to resolve Plaintiff's internal accounting issues and other times to attempt to improve Plaintiff's relationships with its partner banks by representing to the banks that the repossessed vehicles were being sold at favorable prices that were near to or greater than the balance owed on the delinquent loan.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 7. Pope Decl. ¶ 6. | **Undisputed** that the Elias Defendants knew that a purpose of the inflated prices was to represent to the Partner Banks that the vehicles were being sold at higher prices. (Elias Decl. ¶ 7; Pope Decl. ¶ 6; AMF 56.)<br><br>**Disputed (Credibility/Rule 56(d)).** Woodside disputes that this was Woodside's purpose or practice (AMF 32–34) and disputes that the Elias Defendants believed it was. In May 2026, Mr. Elias and Classic Motors denied that Ramos told them Woodside wanted the Partner Banks to believe vehicles were selling for higher prices. (AMF 55.) *See* Evidentiary Objection Nos. 1, 6. |
| 17. During all of Ramos's communications with Mr. Elias, or with Mr. Elias and Ms. Pope, Ramos continually and consistently represented that the arrangement for the purchase of vehicles that he proposed, and for the subsequent partial reimbursement of overpayment for the vehicles to Classic | **Disputed (Credibility/Rule 56(d)).** The testimony identifies no date or medium of any communication and attaches none. Woodside discovered Ramos's scheme in October 2024 and reported it as a theft. (AMF 34.) *See* Evidentiary Objection Nos. 1, 3, 6. |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| Motor, was known to and desired by Plaintiff, and that Ramos was coordinating the transactions in this manner in his capacity and as part of his responsibilities as an executive officer for Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 7. Pope Decl. ¶ 6. | |
| 18. For a given repossessed vehicle for which Ramos was arranging a sale to Classic Motor, which Ramos represented was on Plaintiff's behalf, after Ramos informed Mr. Elias (or Mr. Elias and Ms. Pope) of the purchase price and the expected reimbursement amount for the intended overpayment, and after Mr. Elias agreed to purchase the vehicle, Mr. Elias, or Ms. Pope at his direction, would issue payment from Classic Motor to an account designated by Ramos.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Disputed (Credibility/Rule 56(d)).** The Elias Defendants have produced no record of any payment, identify no account, and refused to answer interrogatories about their payments and bank accounts. (AMF 60, 62–64.) For four vehicles, no sale proceeds reached Woodside or any Partner Bank. (AMF 52–54.) |
| 19. The name of the account Ramos designated included the name "Woodside Credit, LLC," indicating that this was an official account owned and operated by Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Disputed (Credibility/Rule 56(d)).** The declarants do not state the full name of the account and attach no check, wire record, or statement. Ramos controlled a Chase account titled "Ramos-Woodside Credit, LLC," into which he deposited an intercepted check payable to Woodside. (AMF 35.) *See* Evidentiary Objection No. 2. |
| 20. After each purchase, Elias Defendants would receive payment for the reimbursement amount from an entity | **Undisputed** that the Elias Defendants received forty-eight checks and wires totaling $1,419,803 from the Montana agent's account, on checks styled "Agent |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| identified as Agent for Montana Woodside Escrow Account.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | for Montana Woodside Escrow Account." (AMF 38.)<br><br>**Disputed** that the payments came "[a]fter each purchase" or were a "reimbursement amount." (AMF 33, 39–40, 44–46.) |
| 21. Ramos represented to Elias Defendants that Agent for Montana Woodside Escrow Account was a contractor for Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Disputed (Credibility/Rule 56(d)).** The Montana agent was a title agent to which Ramos diverted Woodside's TT&L funds. (AMF 32–33.) *See* Evidentiary Objection Nos. 1, 6. |
| 22. The reimbursement payments were typically made out to Classic Motor, though on a small number of occasions they were made out to Mr. Elias, and on one occasion made out to Ms. Pope.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Undisputed** that thirty-nine payments were payable to Classic Motor Inc, eight (totaling $135,247) to Mr. Elias personally, and one ($35,000) to Ms. Pope. (AMF 41.) **Disputed** that the payments were "reimbursement[s]." (AMF 33, 44–46.) |
| 23. Mr. Elias and Ms. Pope did not and do not know why some payments were made out to them rather than to Classic Motor, and Ramos never explained this.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Disputed (Credibility/Rule 56(d)).** In May 2026, Ms. Pope stated that, "[b]ased on communications from Alexander Ramos," she "came to understand that Alexander Ramos mistakenly believed that [she] intended to personally retain the vehicle for personal use, and that the check was intended as a refund for overpayment." (AMF 57; Neri Decl. Ex. F at 7.) She also denies the check was connected to the vehicle purchased the next day. (AMF 45, 59.) |
| 24. After the purchase, Classic Motor would receive title for the vehicle and the | **Undisputed** for purposes of this motion as to the twenty-one vehicles listed on Neri Decl. Ex. J. **Disputed** as to the four |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| vehicle, after arranging for any necessary transportation.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | additional vehicles the Elias Defendants admit possessing, for which no sale proceeds reached Woodside or any Partner Bank and which the declarations do not address. (AMF 52–54.) |
| 25. Classic Motor would then attempt to resell the vehicle after making any necessary repairs or refurbishments.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 8. Pope Decl. ¶ 7. | **Undisputed** that the Elias Defendants resold the vehicles, and did so at a profit. (AMF 51.) They refused to disclose their resale prices and profits. (AMF 60.) |
| 26. On approximately two occasions, after Classic Motor purchased vehicles through Plaintiff as arranged by Ramos, Ramos contacted Mr. Elias and requested that Classic Motor re-issue payment for an already-purchased vehicle to assist Plaintiff in resolving an accounting issue, and advised Mr. Elias that Plaintiff would ensure that Classic Motor was then reimbursed for the full amount of the re-issued payment, of which Mr. Elias informed Ms. Pope.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 9. Pope Decl. ¶ 8. | **Undisputed** for purposes of this motion that on approximately two occasions Classic Motors paid a second time for a vehicle it had already purchased. (AMF 65.)<br><br>**Disputed (Credibility/Rule 56(d)).** Woodside disputes that the second payments were made "to assist Plaintiff in resolving an accounting issue" and that the Elias Defendants believed so. The Elias Defendants identify no vehicle, date, amount, payee, or account, and have produced no record of these payments. (AMF 62–64.) *See* Evidentiary Objection Nos. 3, 6. |
| 27. Mr. Elias obliged, and Classic Motor re-issued the payments and subsequently received reimbursements.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 9. Pope Decl. ¶ 8. | **Undisputed** for purposes of this motion that Classic Motors made the second payments and later received the amounts back. *See* response to SUF 26. |
| 28. At the time of the transactions, Mr. Elias and Ms. Pope accepted and believed Ramos's representations regarding the | **Disputed (Credibility/Rule 56(d)).** A jury could infer that the Elias Defendants knew Ramos was acting for himself and against |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
| --- | --- |
| nature of the transactions, including that they were known by, on behalf of, and at the behest of Plaintiff; that the account to which Classic Motor directed the purchase payments was owned and operated by Plaintiff, and that these purchase payments were received by Plaintiff; and that the reimbursement payments sent following the vehicle purchases were known by, on behalf of, and at the behest of Plaintiff.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 10. Pope Decl. ¶ 9. | Woodside from, among other things: (1) their admitted knowledge that the prices were inflated so that higher prices could be represented to the Partner Banks (AMF 56); (2) payments averaging more than $67,000 per vehicle, or 79 percent of the stated prices (AMF 37–40); (3) the source of the payments, a Montana title agent with which Ms. Pope had no business relationship, rather than the recipient of the purchase price (AMF 31–33, 47); (4) payments to Mr. Elias and Ms. Pope personally (AMF 41); (5) payments that preceded purchases, outnumbered them, and came in round numbers (AMF 44–46); (6) the "re-issued" payments (AMF 65); (7) four vehicles they possessed for which no proceeds were paid (AMF 52–54); (8) their resale of the vehicles at a profit they refuse to disclose (AMF 51, 60); and (9) the conflicts between their declarations and their discovery responses (AMF 55–59). |
| 29. At the time of the transactions, Mr. Elias and Ms. Pope did not know or believe that Ramos was acting independently from Plaintiff in spite of his executive position with Plaintiff, or that any aspect of the transactions had been arranged and facilitated by Ramos without Plaintiff's knowledge and approval.<br><br><u>Supporting Evidence</u>: Elias Decl. ¶ 10. Pope Decl. ¶ 9. | **Disputed (Credibility/Rule 56(d)).** *See* response to SUF 28. |
| 30. During the period during which the vehicle transactions were occurring, no | **Undisputed** but immaterial. Woodside did not discover Ramos's scheme until |

| Elias Defendants' Undisputed Facts and Supporting Evidence | Woodside's Response and Supporting Evidence |
|---|---|
| employee or officer for Plaintiff contacted Mr. Elias or Ms. Pope regarding the transactions to advise that any aspect thereof lacked Plaintiff's knowledge or approval.<br><br>Supporting Evidence: Elias Decl. ¶ 11. Pope Decl. ¶ 10. | October 2024. (AMF 34.) *See* Evidentiary Objection No. 5. |

**WOODSIDE'S ADDITIONAL MATERIAL FACTS**

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| 31. The loans Woodside originates are owned by Partner Banks; Woodside handles repossession sales for the Partner Banks; and Ramos, as Assistant Vice President, Title & Risk Manager, handled the majority of those sales. | Trevisan Decl. ¶¶ 3–4; Elias Decl. ¶ 6. |
| 32. Ramos directed Woodside TT&L checks to a Montana title agent for borrowers with no Montana connection and directed disbursements from that agent's account. | Trevisan Decl. ¶ 3. |
| 33. The Montana agent issued approximately $1,419,803 in "refund" checks and wires to Fadi Elias, Jennifer Pope, and Classic Motors at Ramos's direction, out of funds Ramos diverted from Woodside. | Trevisan Decl. ¶¶ 3, 8. |
| 34. Woodside discovered Ramos's scheme in October 2024, terminated his access on October 18, 2024, and reported the theft to law enforcement. | Trevisan Decl. ¶ 3. |
| 35. Ramos controlled a Chase Bank account titled "Ramos-Woodside Credit, LLC," into which he deposited, among other things, an insurer's payoff check payable to Woodside that he had intercepted. | Trevisan Decl. ¶¶ 8, 11. |

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| 36. Woodside has paid its Partner Banks $912,979.93 in payoffs and principal reductions on repossession-sale and collateral transactions corrupted by Ramos. | Trevisan Decl. ¶¶ 4, 6(b). |
| 37. The Elias Defendants admit purchasing approximately twenty-one vehicles from or through Woodside between March 23, 2023 and October 10, 2024, with Ramos as their point of contact. Woodside's schedule lists twenty-one sales at stated prices totaling $1,801,000. | Neri Decl. Ex. A, RFA Nos. 6, 13; Ex. B, RFA No. 11; Neri Decl. ¶ 10 & Ex. J. |
| 38. Woodside's schedule lists forty-eight checks and wires from the Montana agent's account to Classic Motors, Mr. Elias, and Ms. Pope between March 15, 2023 and October 10, 2024, totaling $1,419,803. | Neri Decl. ¶ 10 & Ex. K; Trevisan Decl. ¶ 8. |
| 39. $1,419,803 is an average of more than $67,000 for each of approximately twenty-one vehicles, and approximately 79 percent of $1,801,000. | Trevisan Decl. ¶ 8; Neri Decl. Ex. B, RFA No. 11; Exs. J–K. |
| 40. The Elias Defendants state that they paid $80,000, $55,000, $7,000, and $61,500 for the four vehicles whose purchase prices they disclosed. | Neri Decl. Ex. D at 7–9; Ex. E at 8–9. |
| 41. Payments were made payable to Fadi Elias personally and to Jennifer Pope personally. On Woodside's schedule, thirty-nine payments were payable to Classic Motor Inc; eight, totaling $135,247, to Fadi Elias; and one, for $35,000, to Jennifer Pope. | Elias Decl. ¶ 8; Pope Decl. ¶ 7; Neri Decl. Ex. A, RFA No. 14; Ex. C, RFA No. 8; Ex. K. |
| 42. Classic Motors received a $30,000 check from the Montana agent dated July 18, 2023, and wire transfers of $200,000 on July 5, 2024, $100,000 on July 22, 2024, and $55,000 on July 25, 2024. | Neri Decl. Ex. B, RFA Nos. 13–16. |
| 43. The Elias Defendants admit that some of the checks bear the word "Refund" on the memo line. | Neri Decl. Ex. A, RFA No. 17; Ex. B, RFA No. 18. |

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| 44. An $11,465 check from the Montana agent payable to Fadi Elias is dated March 15, 2023, eight days before Mr. Elias paid $80,000 for a 2019 Bentley Bentayga on or about March 23, 2023, the earliest sale on Woodside's schedule. | Neri Decl. Ex. A, RFA Nos. 9, 14; Ex. D at 7; Exs. J–K. |
| 45. The $35,000 check payable to Ms. Pope is dated February 8, 2024. Woodside's schedule shows the sale of a 2022 Aston Martin Vantage to Mr. Elias for $136,000 on February 9, 2024, and a further $36,000 check to Classic Motor Inc dated February 14, 2024. | Neri Decl. Ex. C, RFA No. 8; Ex. A, RFA No. 10; Exs. J–K. |
| 46. On Woodside's schedules there are forty-eight payments and twenty-one sales, and thirty of the forty-eight payments are in multiples of $5,000, including eight of $35,000, seven of $25,000, and four of $40,000. | Neri Decl. Exs. J–K. |
| 47. Before the transactions at issue, Ms. Pope had no independent business relationship with the Montana agent or Amy Fisher. | Neri Decl. Ex. C, RFA No. 29. |
| 48. Ms. Pope was aware that Mr. Elias and/or Classic Motors were receiving payments from the Montana agent in connection with the purchase of vehicles. | Neri Decl. Ex. C, RFA No. 13. |
| 49. Ms. Pope communicated directly with Ramos, had signatory authority on bank accounts of Classic Motors and of Mr. Elias, and assisted with "paperwork for vehicle purchases." | Neri Decl. Ex. C, RFA Nos. 4, 6, 18; Ex. E at 6. |
| 50. Mr. Elias and Classic Motors knew that Ramos held the title Assistant Vice President, Title & Risk Manager at Woodside, and Ms. Pope knew Ramos was employed by Woodside. | Neri Decl. Ex. A, RFA No. 19; Ex. B, RFA No. 10; Ex. C, RFA No. 7. |

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| 51. The Elias Defendants resold vehicles purchased through Ramos and earned a profit. | Neri Decl. Ex. A, RFA Nos. 23–24; Ex. B, RFA Nos. 23–24; Ex. C, RFA No. 27. |
| 52. The Elias Defendants admit that four additional repossessed vehicles — a 1972 Chevrolet Chevelle, a 2019 Rolls Royce, a 2005 Rolls Royce Wraith, and a 2020 Mercedes G Class — were at some point in their possession, custody, or control. | Neri Decl. Ex. A, RFA No. 25; Ex. B, RFA No. 25; Ex. C, RFA No. 30. |
| 53. Ms. Pope admitted a request describing those four vehicles as vehicles "for which neither Woodside nor its PARTNER BANKS received any sale proceeds." Woodside's schedule shows no sale price for them and original loan balances totaling $661,823.70. | Neri Decl. Ex. C, RFA No. 30; Ex. J. |
| 54. The Elias and Pope declarations do not address the four vehicles, and Classic Motors refused to answer the interrogatory asking about their acquisition and disposition. | Elias Decl. ¶¶ 1–11; Pope Decl. ¶¶ 1–10; Neri Decl. Ex. E at 16. |
| 55. In May 2026, Mr. Elias and Classic Motors each denied a request to admit that Ramos told them "that Woodside wanted the PARTNER BANKS to believe that automobiles were selling for higher prices than what they would actually sell for." | Neri Decl. Ex. A, RFA No. 8; Ex. B, RFA No. 19. |
| 56. In their September 2026 declarations, Mr. Elias and Ms. Pope state that Ramos told them the purchase prices were "intentionally inflated," in part "to attempt to improve Woodside Credit's relationships with its partner banks by representing to the banks that the repossessed vehicles were being sold at favorable prices that were near to or greater than the balance owed on the delinquent loan." | Elias Decl. ¶ 7; Pope Decl. ¶ 6. |
| 57. In May 2026, Ms. Pope stated that she "did not know what the purpose of this payment was at the | Neri Decl. Ex. F at 7. |

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| time" she received the $35,000 check, and that, "[b]ased on communications from Alexander Ramos," she "came to understand that Alexander Ramos mistakenly believed that [she] intended to personally retain the vehicle for personal use, and that the check was intended as a refund for overpayment." | |
| 58. In her declaration, Ms. Pope states that she "did not and do[es] not know why some payments were made out to Fadi Elias or to [her] rather than to Classic Motor, and Ramos never explained this." | Pope Decl. ¶ 7. |
| 59. Ms. Pope denied that the $35,000 check was connected to the purchase of the 2022 Aston Martin Vantage. | Neri Decl. Ex. C, RFA No. 11. |
| 60. The Elias Defendants refused to answer interrogatories asking them to describe their communications with Ramos, what Ramos told them about the reason for each payment, the facts supporting their defenses of fraudulent inducement and misrepresentation by others, their bank accounts, and their resale prices, profits, and any sharing of profits with Ramos. | Neri Decl. ¶ 5; Ex. D at 9–19; Ex. E at 10–19; Ex. F at 11–19. |
| 61. None of the Elias Defendants' interrogatory answers is verified. | Neri Decl. ¶ 4. |
| 62. The Elias Defendants committed in writing to produce documents in thirty-two categories upon entry of a protective order; the protective order was entered May 18, 2026; and they have produced no documents. | Neri Decl. ¶ 6; Dkt. 35; Dkt. 37-2 ¶ 7 & Ex. C. |
| 63. The Elias Defendants' initial disclosures identify "[p]roof of payments for vehicles and related documents"; none has been produced, and none accompanies the motion. | Neri Decl. ¶ 7 & Ex. H. |

| Woodside's Additional Material Facts | Supporting Evidence |
|---|---|
| 64. The Elias and Pope declarations attach no documents and identify no specific vehicle, payment date, amount, account, or communication. | Elias Decl. ¶¶ 1–11; Pope Decl. ¶¶ 1–10. |
| 65. On approximately two occasions, Classic Motors "re-issue[d] payment for an already-purchased vehicle" and later received the amount back. | Elias Decl. ¶ 9; Pope Decl. ¶ 8. |
| 66. Classic Motors held a California dealer license for approximately twenty-five years. | Neri Decl. Ex. E at 3. |
| 67. Woodside's January 15, 2026 initial disclosures identified Mr. Trevisan, the Montana agent's bank records, the records of forty-eight checks and wires totaling $1,419,803, the records of twenty-one vehicle purchases totaling $1,801,000, and the schedules attached to the Complaint as Exhibits A and B. | Neri Decl. ¶ 7 & Ex. G at 2, 4. |

Respectfully submitted,

DATED: September 18, 2026

BROWN NERI SMITH & KHAN LLP

By: /s/ Geoffrey A. Neri
Geoffrey A. Neri
Attorneys for Plaintiff
WOODSIDE CREDIT, LLC