Geoffrey Neri (SBN 258802)
Geoff@bnsklaw.com
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

WOODSIDE CREDIT, LLC, a California limited liability company,

Plaintiff,

vs.

ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,

Defendants.

Case No. 8:25-cv-02146-FWS-JDE

**DECLARATION OF BRIAN TREVISAN, EXECUTED AUGUST 21, 2026, RE-FILED IN SUPPORT OF PLAINTIFF WOODSIDE CREDIT, LLC'S OPPOSITION TO DEFENDANTS FADI ELIAS, JENNIFER POPE, AND CLASSIC MOTORS, INC.'S MOTION FOR SUMMARY JUDGMENT OR ADJUDICATION**

[Previously filed August 24, 2026 with Dkt. 38; re-filed without exhibits and without change. Filed concurrently with Opposition; Statement of Genuine Disputes; Declaration of Geoffrey A. Neri and exhibits thereto; and Evidentiary Objections]

Date: October 15, 2026
Time: 10:00 a.m.
Crtrm.: 10A

Complaint Filed: Sept. 22, 2025
Trial Date: February 2, 2027

Geoffrey Neri (SBN 258802)
Geoff@bnsklaw.com
BROWN NERI SMITH & KHAN LLP
11601 Wilshire Boulevard, Suite 2080
Los Angeles, California 90025
Telephone: (310) 593-9890
Facsimile: (310) 593-9980

Attorneys for Plaintiff
WOODSIDE CREDIT, LLC

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

WOODSIDE CREDIT, LLC, a California limited liability company,

Plaintiff,

vs.

ALEXANDER G. RAMOS, an individual; FADI ELIAS, an individual; JENNIFER POPE, an individual; CLASSIC MOTORS, INC., an Arizona business entity of unknown organization; and DOES 1 through 20, inclusive,

Defendants.

Case No. 8:25-cv-02146-FWS-JDE

**DECLARATION OF BRIAN TREVISAN IN SUPPORT OF PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT AGAINST DEFENDANT ALEXANDER G. RAMOS**

Date: September 24, 2026
Time: 10:00 a.m.
Crtrm.: 10A

# DECLARATION OF BRIAN TREVISAN

I, Brian Trevisan, declare as follows:

1. I am an Executive Vice President of Plaintiff Woodside Credit, LLC ("Woodside"). I was Alexander G. Ramos's ("Ramos") supervisor during the period relevant to this action, and I participated directly in Woodside's October 2024 discovery and investigation of the misconduct described below. I have personal knowledge of the facts set forth in this declaration, or know them from my review of Woodside's business records described herein and from my supervision of Woodside's remediation effort, and if called as a witness I could and would testify competently to them. I make this declaration in support of Woodside's Motion for Default Judgment Against Defendant Ramos (the "Motion").

2. *Records foundation.* The Woodside records referenced in this declaration and attached as exhibits are records of a regularly conducted activity of Woodside: they were made at or near the time of the events they record, by (or from information transmitted by) persons with knowledge of those events; they are kept in the course of Woodside's regularly conducted business activity; and making and keeping them is a regular practice of that activity. *See* Fed. R. Evid. 803(6). I am familiar with Woodside's accounting and record-keeping systems; the accounting entries summarized below were made and maintained by Woodside's accounting department in the ordinary course of business under controls with which I am familiar; and I am a qualified witness to authenticate them. The summary schedules attached hereto accurately summarize voluminous underlying records, which Woodside will make available to the Court or any party upon request. *See* Fed. R. Evid. 1006.

3. *Ramos's position and scheme.* Ramos was employed by Woodside from 2017 until Woodside terminated his access in October 2024, most recently as Assistant Vice President, Title & Risk Manager. In that position, Ramos supervised the employees who

processed disbursements of tax, title, and licensing funds ("TT&L Fees") that Woodside holds and remits for its borrowers; had authority to initiate and direct TT&L check requests, including the selection and use of outside title agents; and handled the majority of Woodside's repossession sales with the partner banks that own Woodside-originated loans ("Partner Banks"). In October 2024, I participated in the investigation through which Woodside discovered that Ramos had, among other things, directed Woodside TT&L checks to a Montana title agent for borrowers with no Montana connection and directed disbursements from that agent's account, including checks payable to "Woodside Credit" that Woodside never received. Woodside terminated Ramos's systems access on October 18, 2024 and reported the theft to law enforcement.

4. *Consequence of the thefts.* Because Ramos diverted funds that Woodside held to pay borrowers' sales tax, title, registration, and licensing obligations — and corrupted repossession-sale transactions Woodside handled for its Partner Banks — Woodside was required to pay out of its own funds, a second time, the amounts necessary to make its borrowers and Partner Banks whole: completing registrations and titles through replacement agents and state DMVs, refunding borrowers, paying off or reducing Partner Bank balances on corrupted transactions, and paying related costs. Woodside's accounting department tracked each such remediation payment in its general ledger under a dedicated loss-due-to-theft account (account no. 5495).

5. *The remediation schedule.* Attached hereto as **Exhibit 1** is a true and correct copy of Woodside's schedule of loss-due-to-theft payments. The schedule reflects **109 payments made between October 24, 2024 and February 20, 2026, totaling $1,890,005.07**, each identified by date, check or reference number, payee, affected loan number, memo description, and amount. The schedule was prepared and is maintained by Woodside's accounting department in the ordinary course of business, and I have reviewed it and confirmed it against Woodside's underlying accounting and banking records.

Woodside provided this same loss schedule to the United States Attorney's Office in connection with the parallel criminal prosecution of Ramos. The version of Exhibit 1 filed on the public docket redacts nonparty borrower names, all but the last three digits of loan numbers, and financial-account information; the unredacted version is submitted under seal pursuant to Woodside's concurrently filed Application for Leave to File Under Seal.

6. *Categories of remediation payments.* The 109 payments comprise: (a) re-payment of borrowers' TT&L obligations that Ramos had diverted — payments to replacement title agents, state departments of motor vehicles, VIN verification services, and similar payees, and TT&L refunds paid directly to borrowers; (b) **$912,979.93** in payoffs and principal reductions paid to Partner Banks in connection with repossession-sale and collateral transactions corrupted by Ramos — specifically, payments on Loan Nos. [redacted]392 ($195,851.77), [redacted]579 ($36,700.00), [redacted]801 ($180,966.19), [redacted]340 ($299,000.00), [redacted]148 ($60,000.00), [redacted]092 ($76,467.93), [redacted]962 ($51,123.00), [redacted]710 ($8,560.40), and [redacted]277 ($4,310.64); and (c) related out-of-pocket costs, including towing and filing fees, borrower settlements, and write-offs recorded as losses due to the theft. (Ex. 1.)

7. *Outside title agent transactions.* A portion of the remediation payments reflected on Exhibit 1 relates to loan transactions Woodside had routed through outside title agents under Ramos's supervision — including transactions sent to Registration Express Service, a California title agent, for which Woodside disbursed TT&L funds that were never applied to the borrowers' registrations. The selection, use, and oversight of outside title agents was within Ramos's responsibility as Title & Risk Manager, and the failures of these transactions were discovered as part of the same investigation of Ramos's conduct. Woodside re-completed these registrations at its own expense, and those re-payments are included in Exhibit 1.

8. *No double counting.* Exhibit 1 does not include, and Woodside does not by the Motion separately seek, the face amounts of the TT&L checks Ramos diverted to the

Montana title agent, the approximately $1,419,803 in "refund" checks and wires that the Montana agent issued to Fadi Elias, Jennifer Pope, and Classic Motors, Inc. at Ramos's direction, or the amounts deposited into the "Ramos-Woodside Credit, LLC" Chase Bank account Ramos controlled. Those diverted funds are what made the remediation payments in Exhibit 1 necessary; Exhibit 1 measures Woodside's actual out-of-pocket cost of restoration, and is therefore a conservative measure of Woodside's loss.

9. *Backup records.* Attached as **Exhibit 2** are true and correct copies of underlying payment records supporting the entries on Exhibit 1, including check images, electronic funds transfer confirmations, and check register excerpts. Woodside will make the complete set of underlying records available to the Court or any party upon request. *See* Fed. R. Evid. 1006. The version of Exhibit 2 filed on the public docket is redacted in the same manner as Exhibit 1; the unredacted version is submitted under seal.

10. *Total loss.* Woodside's out-of-pocket loss proximately caused by Ramos's conduct, as reflected on Exhibit 1, is **$1,890,005.07**. This figure is consistent with, and conservative relative to, the damages computation in Woodside's initial disclosures (no less than $4,000,000, which encompassed the gross diverted funds). For purposes of the Motion, Woodside seeks $1,890,005.07, which does not exceed the $4,000,000 demanded in the Complaint's Prayer for Relief.

11. *Insurance recovery; no other offsets.* Woodside's total out-of-pocket remediation payments arising from Ramos's conduct were $2,260,423.66. One of the remediated losses arose from a 2022 loan of $372,155.57 that financed a borrower's purchase of a Rolls Royce Cullinan. The vehicle was stolen in March 2024 and later declared a total loss, and the vehicle's insurer issued a payoff check to Woodside — which Ramos intercepted and deposited into the "Ramos-Woodside Credit, LLC" Chase account while representing to the Partner Bank that the insurance payment remained outstanding. After discovering the theft in October 2024, Woodside paid off the Partner Bank loan itself

and submitted a claim to the insurer, which subsequently reissued payment to Woodside of $370,418.59. The schedule attached as Exhibit 1 is net of that $370,418.59 recovery. Other than that recovery, no portion of the losses reflected on Exhibit 1 has been repaid to, or recovered by, Woodside from any source — whether through restitution, forfeiture remission or restoration, recovery from any co-defendant, or otherwise.

12. *Prejudgment interest.* Attached as **Exhibit 3** is a prejudgment-interest computation, prepared at my direction and verified by me, applying simple interest at seven percent (7%) per annum to each payment on Exhibit 1 from the date Woodside made that payment through September 24, 2026, the noticed hearing date on the Motion. The interest so computed totals **$230,822.32**, and accrues thereafter at **$362.47** per day.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on August 21, 2026, at Newport Beach, California.

Brian Trevisan

# INDEX OF EXHIBITS

**Exhibit 1** Woodside Credit loss-due-to-theft payment schedule — 109 remediation payments, October 24, 2024 through February 20, 2026, totaling $1,890,005.07 (Fed. R. Evid. 1006 summary of Woodside accounting records) (redacted; unredacted version filed under seal)

**Exhibit 2** Underlying payment records — check images, electronic funds transfer confirmations, and check register excerpts (redacted; unredacted version filed under seal)

**Exhibit 3** Prejudgment-interest computation — seven percent (7%) per annum, simple, from each payment date through September 24, 2026